CASERA FOODS, INC., demandante y recurrida, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, demandado y recurrente.

*Número:* R-79-155 *Resuelto:* 27 de junio de 1979

*Héctor A. Colón Cruz, Procurador General,* y *Miguel A. Santana Bagur, Procurador General Auxiliar,* abogados del recurrente; *José F. Quetglas Alvarez,* abogado de la recurrida.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

El marco conceptual de la doctrina envuelta en este recurso es:

"El anhelo de justicia innato en todos, cuando nos ahogan u oprimen el precepto tajante y la estipulación rígida, busca caminos de evasión, refugios equitativos, y la doctrina sugiere fórmulas y fabrica construcciones; los tribunales eligiendo el cauce de un precepto generoso, prefieren una decisión justa a una resolución técnicamente perfecta, imponiéndose abordar la cuestión por vía institucional, pues como dice *Dualde,* por ella la justicia aparece en la consciencia como vía de inspiración, dándonos súbitamente la conclusión mientras permanecen invisibles las premisas conductoras." J. Terraza Martorell, *Modificación y Resolución de los Contratos por Excesiva Onerosidad o Imposibilidad en su Ejecución—Teoría de la Cláusula Rebus Sic Stantibus,* (1969), págs. 33-34.

I

Casera Foods, Inc.—empresa local elaboradora y enlatadora de productos alimenticios, que desde el 1968 suple al

Programa de Comedores Escolares del Departamento de Instrucción—durante el año 1974 resultó la licitadora más baja y adjudicataria de la buena pro de tres subastas. Se obligó a entregar, envasada en latas con un peso neto de 20 onzas, un total de 3,223 cartones de papaya fresca en tajadas o trocitos sembrada y cosechada en Puerto Rico. Cumplió con la primera subasta, aunque tuvo que pagar por una demora causada por moho en algunas latas.

Durante el período comprendido entre el 7 de junio al 25 de noviembre de 1974, suplió 11,373 cartones de papaya con relación a las dos subastas restantes. Sin embargo, no suministró el remanente, justificando tal incumplimiento en una escasez imprevista, pero real, de papaya verde a nivel comercial entre los diversos productores en Puerto Rico.[1] Como alternativa, propuso y solicitó se le permitiera elaborar y entregar papaya importada. Ello se le negó, aunque se le concedió oportunidad para tratar de superar este inconveniente. Transcurrido en exceso tiempo suficiente para que cumpliera, a mediados del 1975, Instrucción Pública procedió de acuerdo con las condiciones de la subasta y, con carácter de emergencia, compró a la firma Tropical Fruits de San Germán 6,285 cartones de papaya—de igual calidad y requisitos—pero a un precio mayor cuyo resultado arrojó una

---

[1] La determinación del tribunal sobre este extremo reza:

"La realidad de esta escasez fue confirmada por la Corporación de Desarrollo Agrícola, agencia pública ante quien acudió la demandante en busca de solucionar la situación creada. A través de esta entidad pública la demandante pudo comprobar que los mismos productores en Puerto Rico del citado producto localizados en las áreas de Canóvanas, Carolina, Lares y Santa Isabel, no disponían de la misma a escala comercial. Otros productores tenían sus cosechas comprometidas. En tales circunstancias la demandante instruyó a su personal a cargo de comprar cualquier cantidad que estuviese disponible en el mercado. Sin embargo, la misma se había realmente agotado. Como demora un año desde que se siembra hasta que se cosecha, no le era posible cumplir con las entregas dentro del plazo estipulado. Esta situación era imprevista para la demandante y no le era posible evitarla mediante la contratación previa con los productores a base de un plan de suministro fijo ya que debía esperar a obtener la buena pro de la subasta para entonces adquirir el producto.

Normalizada la situación de la escasez al venir la nueva cosecha, prosiguió la demandante efectuando sus entregas en la forma convenida en las subastas."

diferencia e incremento en costo de $41,480.00. En virtud de la cláusula 12 de las Condiciones e Instrucciones Especiales de las subastas, se le descontó y retuvo dicha cantidad de un pago posterior relacionado con otra subasta.

Casera reclamó judicialmente su devolución e intereses, alegando esencialmente que su incumplimiento se debió a causas fuera de su control. La ilustrada sala de instancia acogió tal planteamiento y dictó sentencia a su favor aplicando el principio comprendido en la cláusula *rebus sic stantibus*. El Estado solicitó revisión.

## II

Un breve peregrinaje de la génesis y evolución teórica de esta cláusula nos remonta a la "práctica forense de los tiempos medievales, que consideraban sobreentendida siempre en los contratos a largo plazo o de tracto sucesivo la cláusula *rebus sic stantibus* (abreviación de la frase *contractus qui habent tractum succesivum vel dependentiam de futuro rebus sic stantibus intelligimtur*), por virtud de la cual, si sobrevenía un cambio importante en el estado de hecho existente o contemplado por las partes al contratar, podía el obligado resolver el contrato que se le había hecho demasiado oneroso." Castán, *Derecho Civil Español, Común y Foral*, Tomo 3, pág. 548 (1974). Sin embargo, con el tiempo su vigencia fue perdiendo importancia, cayó en descrédito y quedó postergada. Las decisiones judiciales y los movimientos de codificación subsiguientes la rechazaron en aras de una fidelidad contractual absoluta para lograr mayor seguridad en el comercio jurídico. Calderón, Jr., *La Cláusula Rebus Sic Stantibus y el Riesgo Imprevisible en el Derecho Puertorriqueño*, 19 Rev. C. Abo., págs. 6–7 (1958); M. Royo Martínez, *Concepto del Contrato en el Derecho Moderno*, Rev. Gen. de Legis. y Juris., (1945), Tomo IX (Segunda Época), págs. 113–169. Ello explica el por qué no existe en el Código Civil español ni en el nuestro precepto que expresamente la recoja. A comienzos de este siglo, con el trastoque que sufrió el

comercio en Europa con la Primera Guerra Mundial y conflictos bélicos sucesivos, el principio despertó de su letargo y comenzó a debatirse y relucir en aquella litigación en que los hechos evidenciaban cambios y situaciones graves e impredecibles. L. Diez-Picazo y A. Gullón, *Sistema de Derecho Civil*, Vol. II, págs. 211–214; Beltrán de Heredia y Castaño, *El Cumplimiento de las Obligaciones*, (1956), págs. 334–337. [2] Sin embargo, hoy en día en ". . . España, la revisibilidad del contrato por alteración de las circunstancias básicas dentro de las cuales se produce, ha ido ganando terreno en la jurisprudencia."[3] Para un análisis de esta casuística, véase Puig Brutau, *Fundamentos de Derecho Civil*, Tomo II, Vol. II, (1954), págs. 372–379; Rivero Ysern, *El Contrato Administrativo de Suministro*, (1976), págs. 193–211. La cláusula *rebus sic stantibus*, es la fórmula de mayor aceptación entre las variadas teorías sobre la revisión de contratos por alteración de las circunstancias.[4]

■ Representa un contrapeso a la rigidez y absolutismo expuesto en la prédica de sostener a ultranza, en todo momento y circunstancia, la voluntad contractual de las partes simbolizada en la conocida máxima *pacta sunt servanda* recogida en el Art. 1044 del Código Civil.[5] Su justificación se

---

[2] Estos autores, en posición minoritaria en la doctrina española rechazan por insatisfactoria la cláusula. Los primeros, aduciendo que el concepto de disposición sobreentendida es ficticio, y que su teoría es demasiado vaga e imprecisa; y el segundo, por estimar solo posible la revisión contractual allí donde el derecho objetivo la admita expresamente, gestión que corresponde al Legislador y no al Juez.

[3] *Rodríguez* v. *Municipio*, 75 D.P.R. 479, 491 (1953). Este caso representa la única expresión de este foro sobre imprevisión contractual en el cual se analizan, indistintamente, las normas de imprevisión y caso fortuito. Calderón, Jr., Jurisprudencia: *La Imprevisión, El Caso Fortuito y el caso Rodríguez López v. Municipio de Carolina*, 24 Rev. Jur. U.P.R. págs. 171–179 (1954). Sobre las diferencias entre imprevisión y caso fortuito, consúltese F. Soto Nieto, *El Caso Fortuito y la Fuerza Mayor*, Ed. Nauta (1967).

[4] Para una síntesis sistemática de las mismas, véase: F. Soto Nieto, *Revisión Contractual por Alteración de las Circunstancias. Cláusula "Rebus Sic Stantibus"*, Derecho Vivo, II, págs. 391–402 (1971). Badenes Gasset, *El Riesgo Imprevisible*, (1946) pág. 65 *et seq.*; Castán, *op. cit.*, págs. 545–551.

[5] "Las obligaciones que nacen de los contratos tienen fuerza de ley entre las

explica así: "Mas a veces, y sobre todo en momento de crisis económica o cuando se trata de contratos de ejecución sucesiva y larga dimensión, ese cambio de circunstancias [ajeno a la actuación y voluntad de las partes] puede hacer excesivamente onerosa para una de las partes la ejecución de lo convenido o puede convertir el contrato en objetivamente injusto." Castán, *op. cit.*, pág. 544. En tales casos, ". . . debe operar la equidad para restaurar el desequilibrio producido, o, por lo menos, atenuar los perjuicios apreciados. . . ." J. Sánchez del Valle, *Sugerencias a la Doctrina de la Cláusula Rebus Sic Stantibus*, 27 Rev. Crítica Derecho Inmobiliario, pág. 262 (1954). Se fundamenta en ciertas premisas latentes en la teoría general de las obligaciones y contratos, a saber, la buena fe, la lesión contractual, el enriquecimiento injusto, el abuso del derecho y la equidad contractual. J. Lluis y Navas Brusi, *La Llamada Cláusula "Rebus Sic Stantibus" Como Delimitadora del Alcance del Principio de que los Pactos Han de Ser Observados*, Rev. Gen. de Legis. y Juris., Tomo XXXIII (Segunda Epoca), págs. 383–390 (1956). Heredia y Castaño, *op. cit.*, págs. 337–346. A tal efecto, "con el funcionamiento de la teoría de la imprevisión 'la seguridad en el tráfico queda más bien reforzada, pues los contratantes pueden contar con que en caso de perturbación extraordinaria, el negocio se podrá dejar sin efecto o amoldarlo a las nuevas circunstancias'. La doctrina sería una justa consecuencia de los principios de buena fe y de la reciprocidad en los contratos bilaterales; y no hay nada que se oponga a su incorporación fuera de los casos en que existe una disposición concreta, como en los artículos 1465, 1466, 1485 y 1517 del Código Civil." Calderón Jr., *op. cit.*, pág. 177.

■ Los requisitos admitidos por la glosa para que se dé la revisión judicial del contrato, los expone Castán:

"Para que la revisión sea admisible es preciso que medien

partes contratantes, y deben cumplirse al tenor de los mismos." (31 L.P.R.A. sec. 2994.)

circunstancias muy especiales y extraordinarias y entre ellas las siguientes: a) el carácter imprevisible del acontecimiento que haya surgido; b) que la ejecución del contrato resulte extremadamente difícil u onerosa, de tal modo que constituya para el deudor una lesión que no guarde proporción con la ventaja prevista para él en el contrato; c) que el contrato no tenga un carácter aleatorio o de pura especulación con el que las partes quisieron prever en cierto modo la posibilidad del acontecimiento.

Roca y Puig Brutau, con mayor minuciosidad, señalan como condiciones que integran el supuesto de aplicación de la doctrina del riesgo imprevisible (entendida ésta en un sentido genérico, que comprende, claro es, la de la cláusula rebus) las siguientes:

1) La fundamental de la imprevisibilidad que implica una cuestión de hecho dependiente de las condiciones que concurran en cada caso.

2) Que se produzca una dificultad extraordinaria, una agravación de las condiciones de la prestación, de manera que resulte mucho más onerosa para el deudor, sin llegar al grado extraordinario en que se confundiría con la imposibilidad de la prestación, y que es también una cuestión de hecho sobre la que es difícil dar reglas de carácter general.

3) Que el riesgo no haya sido el motivo determinante del contrato, como sucedería en el caso de contrato aleatorio.

4) Que no exista acción dolosa en ninguna de las partes, ya que los efectos de los supuestos delitos y cuasi delitos están especialmente predeterminados en la ley.

5) Que el contrato sea de tracto sucesivo o esté referido a un momento futuro, de modo que tenga cierta duración, pues para los contratos de ejecución instantánea o aquellos que han sido ya ejecutados no existe el problema.

6) Que la alteración de las circunstancias sea posterior a la celebración del contrato (ya que así lo exige la misma naturaleza de acontecimiento imprevisible) y presente carácter de cierta permanencia (elemento que viene exigido también por el carácter extraordinario que se exige a la alteración).

7) Que exista petición de parte interesada." *Op cit.*, págs. 551–553.

En igual sentido se manifiesta Badenes Gasset, *op. cit.*, págs. 123–131.([6])

 Advertimos la necesidad de que estén presentes todos estos factores. Y puntualizamos que se trata de un remedio de excepción, para situaciones extraordinarias en que se impone un prudente y escrupuloso discernimiento judicial de moderación. "Nunca, empero, se recomendará bastante la mayor cautela en la aplicación de estos procedimientos técnicos, cuyo abuso podría echar por tierra la seguridad contractual." Castán, *op. cit.*, pág. 554. Una vez demostradas las concurrencias de estos requisitos, el ámbito remedial del tribunal es amplísimo y flexible. "[L]a verdadera misión que incumbe a los tribunales en estos casos . . . [,] indudablemente es la de *procurar que se logre un resultado equitativo y justo en una situación que no ha sido prevista en el contrato.*" Puig Brutau, *op. cit.*, pág. 365 (Énfasis en el original). "La solución lógica y correcta es lo que tiende a restablecer el equilibrio. . . ." Terraza Martorell, *op. cit.*, pág. 554. Se impone aquel remedio justo y equitativo, a tono con las circunstancias peculiares del caso, e incluye sin limitación, la suspensión temporal de los efectos del contrato, su resolución o rescisión, revisión de precios, suspensión o moratoria y otros. Calderón, Jr., *op. cit.*, págs. 15–16; Badenes, *op. cit.*, págs 56 y 61.

## III

Al aplicar el derecho reseñado a los hechos del caso, se hace patente el error de la respetable sala sentenciadora. Fácticamente está ausente el requisito fundamental de *impredecibilidad* o evento imponderable.

 Casera, como entidad elaboradora y especializada en

---

([6]) Al presente, algunos autores se inclinan, inclusive, a sostener que la aplicabilidad de esta cláusula no está limitada a una categoría específica de contratos. Terraza Martorell, *op. cit.*, págs. 47–48. No nos corresponde pasar juicio sobre este extremo.

la materia objeto del contrato, debió y pudo razonablemente prever y anticipar—a través de un simple estudio del mercado— las proyecciones sobre existencia y disponibilidad de la papaya natural en escala comercial necesaria para cumplir con las obligaciones dimanantes de las subastas. Como indica el tribunal *a quo*, cuando trató de remediar la situación y decidió comprar, algunos "productores [ya] tenían sus cosechas comprometidas." La realidad es que no diseñó un plan de suministro fijo ni contrató previamente con ellos al optar por "esperar a obtener la buena pro de la subasta para entonces adquirir el producto." Estas circunstancias no permiten la aplicación de la cláusula de *rebus sic stantibus.* Está ausente el factor determinante que justifica, como excepción, la intervención y revisión judicial, a saber, "un cambio imprevisto y normalmente imprevisible por las partes." M. Díaz Cruz, Jr., *'Rebus Sic Stantibus' en el Derecho Privado*, Rev. de Legis. y Juris., Tomo XI (Segunda Época), págs. 547–548 (1946); Gómez Ferrer Sapiña, *Algunas Consideraciones en torno a 'Rebus Sic Stantibus' en Derecho Interno e Internacional*, 67 Rev. Der. Not. 135 (1970); Puig Brutau, *op. cit.*, pág. 382; *Méndez v. Jiménez, Comisionado*, 72 D.P.R. 335, 341 (1951).

*Bajo la Regla 50 de nuestro Reglamento, se dictará sentencia expidiendo el auto y revocando la del Tribunal Superior, Sala de San Juan.*

Los Jueces Asociados Señores Dávila y Díaz Cruz concurren en el resultado sin opinión.