**NIKE INTERNATIONAL
LTD., Plaintiff,**

v.

**ATHLETIC SALES, INC.; the Venrod
Corporation, Defendants.**

**Civ. No. 86–0849(RLA).**

United States District Court,
D. Puerto Rico.

July 1, 1988.

Pedro J. Santa, Jorge L. Peirats, O'Neill & Borges, Hato Rey, P.R., for plaintiff.

Edilberto Berrios Pérez, San Juan, P.R., Carlos T. González Contreras, Vazquez

---

Vizcarrondo Alvarez Angelet & Gonzalez, Hato Rey, P.R., Federico Cedó Alzamora, Aida G. Rivera Carattini, Dept. of Justice, San Juan, P.R., for defendants.

## OPINION AND ORDER

ACOSTA, District Judge.

Plaintiff, Nike International Ltd. ("Nike"), filed the present action against defendants, Athletic Sales, Inc. ("ASI") and the Venrod Corporation ("Venrod") seeking a declaratory judgment stating that a Distribution Agreement between Nike and ASI and a Sub–Distributor Agreement between all three parties expired because of ASI's failure to give the required written notice of its desire to extend the term of the Distribution Agreement as specified in the contract. Both defendants counterclaimed against Nike seeking monetary and injunctive relief for the alleged breach of the Puerto Rico Dealer's Act 75 of June 24, 1964 as amended, 10 L.P.R.A. § 278, *et seq.* ("Law 75").

This matter is before us upon plaintiff Nike's motion for partial summary judgment filed on September 10, 1987 (docket No. 33). Nike asserts that ASI failed to renew the Distribution Agreement at the time and in the manner required therein. It further contends that ASI's nonrenewal not only terminated the contract between them, but also extinguished the subcontract ASI and Nike had with codefendant and counterclaimant Venrod and thus feels entitled to partial judgment[1] as a matter of law.

Defendants Venrod and ASI opposed plaintiff's motion. They jointly argue that the renewal clause in the Distribution Agreement is void as contrary to Puerto Rico law and public policy. ASI further argues that "Nike was informed both verbally and in writing ASI's desire to renew and continue the distribution agreement with Nike" (ASI's memorandum in opposi-tion, docket No. 39, p. 9). In addition, defendants counterclaim alleging that Nike is liable to them insofar as they substantially performed their obligations under the contract and thus pursuant to Law 75 they are entitled to specific performance for services rendered and/or for damages resulting from the termination of the contract.

Although ASI filed a petition in bankruptcy under Chapter 11 of Title 11 of the United States Code, those proceedings were "suspended" by bankruptcy Judge Enrique Lamoutte until this Court decides whether or not the Distribution Agreement expired on May 31, 1986 due to ASI's nonrenewal of the same.

The record is now complete and the Court, after careful consideration of the arguments presented by all parties, finds that the Distribution Agreement did expire on May 31, 1986 and hence plaintiff is entitled to partial summary judgment in its favor.

## FACTUAL BACKGROUND

The following is an account of the pertinent and undisputed facts:[2]

1. Nike is a Bermuda corporation with its principal place of business near Portland, Oregon. It distributes athletic footwear, apparel and accessories bearing the "Nike" trademark ("the Nike products") in various areas outside the Continental United States, including Puerto Rico. ASI is a corporation originally formed for the purpose of distributing athletic footwear, apparel, and accessories.

2. On November 29, 1979, BRS, Inc., the predecessor of Nike, appointed ASI distributor of the Nike products in various parts of the Caribbean including Puerto Rico.

3. Thereafter, on February 7, 1984, Nike renewed ASI's appointment as distrib-

---

1. Nike is seeking at this time only a resolution of its declaratory judgment request, leaving for another day the collection of monies claim alleged in its complaint. In addition, our resolution today effectively precludes our having to address Nike's constitutional challenge to Law 75, which, in any event, is of dubious merit, and the same will be dismissed.

2. These facts are taken from the Agreements themselves, the Bankruptcy Court's Opinion and Order filed May 26, 1987, *see In the Matter of Athletic Sales, Inc.*, 86–1189(ESL), and the pleadings.

utor of the Nike products and expanded its distribution "territory." The term of the new agreement was for two (2) years "commencing on June 1, 1984 and ending on May 31, 1986." Thus, the expiration date of the Distribution Agreement was May 31, 1986.

4. Pursuant to the express terms of the Distribution Agreement, ASI had to notify Nike in writing, no later than October 1, 1985, of its desire to extend the duration of the Distribution Agreement beyond May 31, 1986.

5. ASI and Venrod entered into an Agreement ("the Sub–Distributor Agreement") on February 7, 1984, whereby ASI appointed Venrod exclusive sub-distributor of the Nike products in the territory. The Sub–Distributor Agreement was to be effective for a term of seven (7) years, provided ASI's Distribution Agreement with Nike would still be in effect.

6. ASI did not give notice in writing to Nike, on or before October 1, 1985, of its desire to extend the duration of the Distribution Agreement as expressly required by such Agreement. Moreover, although not required to do so, it is undisputed that Venrod, the more active of the two defendants, similarly failed to provide notice of an intent to renew.

7. ASI has no employees or officers other than its President, Mr. Ovidio Torres, who was also a fullfledged employee of Venrod at least from 1984 to 1986 and thereafter has remained a salaried "consultant" to Venrod. ASI at all times had the same principal place of business as Venrod. (*See generally* transcript of the September 30, 1986 deposition of Mr. Torres/ASI and other related exhibits attached to plaintiff's Motion to Dismiss ASI's Bankruptcy Petition, copy of which was filed in conjunction with the parties' Joint Motion Requesting Temporary Stay ... (docket No. 22)).

8. In view of ASI's failure to give the required written notice to renew the contract within the specified period of time, Nike, on May 30, 1986, sent written notice to Venrod and ASI of, *inter alia*, the expi-

ration of the Distribution Agreement. On that date it also filed the instant action. Defendants then counterclaimed.

9. On June 27, 1986 ASI filed a petition in bankruptcy under Chapter 11 of Title 11 of the United States Code. Thereafter, the instant proceedings were stayed pending the Bankruptcy Court's resolution of Nike's motion to dismiss the bankruptcy petition.

10. On May 21, 1987, United States Bankruptcy Judge Enrique Lamoutte "suspended" all proceedings in the Bankruptcy Court until this Court decides whether or not the Distribution Agreement expired on May 31, 1986. *See In re Athletic Sales, Inc.*, No. 86–01189 (Opinion and Order, May 21, 1987).

## DISCUSSION

### Law 75

Law 75 was enacted on June 24, 1964 and is codified in 10 L.P.R.A. § 278 *et seq.* The law reflects a legislative concern for protecting a distributor (read also: dealer) against a principal's (read also: supplier or manufacturer) unjust termination of the distribution agreement. The statute not only protects local distributors from arbitrary terminations by manufacturers, but it goes so far as to bind the manufacturer to the contract unless it can otherwise show a specific form of just cause[3] for the termination. 10 L.P.R.A. § 278a.

In sum, the basic purpose of this law is to highly compensate, (i.e., five times the dealer's average annual profits, plus goodwill) the dealer for the hard-earned clientele unjustly appropriated by the supplier. *See* Statement of Motives of Act No. 75, Vol. 18, Part 4, *Diario de Sesiones* 1724; *see generally* Paul Salamone, *Puerto Rico's Distributor's Law: Law 75: A Primer*, 18:1 Revista Jurídica de la Universidad Interamericana 67 (1983). Law 75 is thus very much a "one-way street" designed to protect dealers from the unwarranted acts of termination by suppliers.

---

3. Just cause is defined as the breach of any of the essential duties in the distribution contract by the distributor or any other action or omission by him which affects adversely and in a substantial manner the rights of the supplier. 10 L.P.R.A. § 278(d).

Although the act gives dealers a right to sue when a supplier, without just cause, unilaterally terminates a contract, it does not, however, protect dealers from their *own* follies which lead to the *preconceived* expiration of distributorship agreements.

■ Law 75, a relatively straightforward statute, is silent as to the effect of a dealer's walking away from an exclusive distribution relationship either by action or omission. And rightly so. The statute looks only to the peccant behavior of the supplier insofar as it is the supplier who is prohibited from unilaterally terminating the contract under the assumption that a dealer (the perceived "small guy") can easily be bankrupted by the loss of a product line which in turn would serve to unjustly enrich the supplier (thus engorging the perceived "big guy"). By enacting the statute, the Puerto Rico legislature showed that it would no longer tolerate the many cases of big (mostly mainland) companies usurping the market infrastructure created by local entities who, in misreliance on the supplier's conduct, assumed they were establishing a long term distributorship. Traditional contract law doctrines offered insufficient recourse in these situations. However, the legislature did not intend that Law 75 be a safe-haven for dealers to avoid the express terms of the contracts to which they willingly subscribed, as is the case of the renewal notice requirement found in the instant contract.

It is important to keep in mind that this is not the typical Law 75 case [4] since it does not involve questions such as whether or not a distribution contract existed; whether or not plaintiff was a distributor in fact; or if the supplier terminated the contract for just cause,[5] etc. Rather, we are dealing here with the direct effect of the distributor, ASI's, conscious failure to provide Nike, the supplier, with *written* notice of renewal. Should we find that this failure to provide written notice is controlling, i.e., that ASI let the contract expire by its own terms, then we need not engage in any further Law 75 analysis—especially as to the issue of just cause—because, as already explained, Law 75 does not protect dealers or distributors from their own conduct which leads to a preconceived expiration of the distributorship.

Finally, whatever determination we make as to ASI would automatically overflow to Venrod since its agreement was completely subsidiary to ASI's. In other words, Venrod's agreement was born and will die with ASI's.

### Validity of Notice Requirement

Contrary to defendants' allegations, the provisions of the Distribution Agreement requiring written notice of renewal are entirely enforceable. The parties were free to establish the terms and conditions they deemed pertinent in their agreement, and unless these were contrary to law, morals or policy, they must be enforced. *See* 31 L.P.R.A. § 2994; *see also* 31 L.P.R.A. §§ 4, 3372, 3421; *Casera Foods, Inc. v. E.L.A.*, 108 D.P.R. 850 (1979); *Capó Caballero v. Ramos*, 83 D.P.R. 650, 673 (1961).

Defendants have attempted to raise the spectre of a violation of public policy in

---

**4.** Probably because this is not the ordinary Law 75 case, there is little, if any, Puerto Rico case law directly on point. Even though none of the parties have requested that we certify this question to the Supreme Court we have nonetheless considered the certification issue carefully and conclude that it is unnecessary because there is sufficient law for us to predict how the local courts would decide the matter if faced with a similar case. *See Bernhardt v. Polygraphic Co. of America*, 350 U.S. 198, 209, 76 S.Ct. 273, 279–80, 100 L.Ed. 199 (1956) ("As long as there is diversity jurisdiction, 'estimates' are necessarily often all that federal courts can make in ascertaining what the state court would rule to be its law") (Frankfurter, J. concurring); *Turcotte v. Ford Motor Company*, 494 F.2d 173, 179,

n. 7 (1st Cir.1974) (District court not precluded from determining how state court *would* rule if faced with same legal question). We find that the statute and agreements in question are clear. The present state law can be determined without need for certification which certainly should not be used to *change* rather than ascertain the law. *Venezia v. Miller Brewing Co.*, 626 F.2d 188, 192, n. 5 (1st Cir.1980). *See also Pan Ame. Comp. Corp. v. Data Gen. Corp.*, 112 D.P.R. 780, 788 (1982) (Requirements for certification).

**5.** Admittedly defendants/counterclaimants hang their hats on the issue of just cause but their assertions alone cannot make this a run-of-the-mill Law 75 case.

their challenge to the renewal clause but nothing in the language or in the legislative history of Law 75 impedes the expiration of the Distribution Agreement when the *dealer* elects to disregard stipulated procedures to notify the principal of a desire to renew the relationship beyond a certain date. In fact, the Supreme Court of Puerto Rico held in *Marina Industrial,* 114 D.P.R. at 72 that "[T]he strict mandate of the aforecited Art. 1233 forces us to abide by the literal sense of the terms of the contract when, as in this case, no doubts remain as to the intention of the contracting parties." *See J. Soler Motors v. Kaiser Jeep Int'l.,* 108 D.P.R. 134 (1978) (a manufacturer-imposed increase in the price of motor vehicles was found not to violate Law 75 because the manufacturer reserved the right in the agreement to alter the prices of the vehicles).

As plaintiff correctly points out, Section 2 of Law 75, 10 L.P.R.A. 278a, prohibits *the principal* from refusing to renew the distribution contract on its normal expiration, except for just cause. However, this provision is inapposite to this case where despite having agreed to comply with certain notice requirements, the dealer failed to abide by the terms of the contract. Consequently, the expiration of the Distribution Agreement in this case is solely due to ASI's own failure to give the required notice. Simply put, Nike cannot be held liable for an act or omission entirely attributable to ASI. *Cf. Caribbean Ins. Services v. American Bankers Life,* 754 F.2d 2 (1st Cir.1985), (principal absolved of Law 75 liability where insurance agent's own omissions placed it outside of the Act's protection). In fact, neither ASI nor Venrod can utilize Law 75 to continue a contract in a way that will defeat its own terms. *See generally Medina & Medina v. Country Pride Foods, Ltd.,* 825 F.2d 1 (1st Cir.1987).

Venrod's contention that the holding in *Gemco Latinoamerica, Inc. v. Seiko Time Corp.,* 623 F.Supp. 912 (D.P.R.1985) precludes the result reached herein is without merit. The facts of *Gemco* are clearly distinguishable from the facts of this case.

In *Gemco* the parties extended a distribution contract in full compliance with its renewal clause. Furthermore, the holding in *Gemco* merely recognized that a *principal* cannot unilaterally terminate or refuse to renew a distribution contract without just cause. *Gemco* is therefore inapposite to a case such as this one where *the dealer* voluntarily omits to exercise its option to extend the contract.

Dealers have a recognized right to rescind a distributorship agreement if they so desire. *See Castillo v. Smart Products,* 289 F.Supp. 138, 140 (D.P.R.1968).[6] Thus, Law 75 does not, and cannot, invalidate contractual clauses establishing procedures for distributors, at their option, to extend the contract beyond a given date.

In sum, nothing in the general principles of contract law nor in Law 75 invalidates mutual agreements requiring dealers to advise of their desire to continue a business relationship beyond a particular date. Law 75 does not release a dealer from its obligation to follow a simple procedure, which the dealer voluntarily agreed to be bound by upon signing the contract. We find such a clause to be entirely binding and enforceable in accordance with its literal terms. 31 L.P.R.A. §§ 3372, 3375, and 3471; *Marina Industrial,* 114 D.P.R. at 72.

### No Written Notice Given

Paragraph number 3 of the Distribution Agreement provides:

> TERM—Unless sooner terminated by either party in accordance with the provisions of this Agreement, the term of this Agreement shall be for a period of two (2) years commencing on June 1, 1984 and ending on May 31, 1986 and effective on the date of signature by both parties. *Should DISTRIBUTOR wish to extend the term of this Agreement, DISTRIBUTOR shall notify NIKE in writing of such desire not later than October 1, 1985* whereupon the parties shall commence, within a reasonable time thereafter, good faith negotiations regarding the extension of the Agreement. If the

---

6. Contrary to ASI's arguments the *Castillo* case directly involved Law 75. *See Castillo,* 289 F.Supp. at 140. ("[T]his is an action under the provisions of Act No. 75, approved by the Legislative Assembly of the Commonwealth of Puerto Rico....").

parties fail to reach agreement by March 1, 1986, there shall be no further obligation to negotiate and this Agreement shall expire in its normal termination date. (Emphasis added)

█ Nike filed a Declaration of Paul D. Pohlen, Jr., its Assistant Corporate Counsel, establishing that "[a]s of October 5, 1985, Nike did not receive the notice in writing stating ASI's or Venrod's desire to extend the duration of the Distribution Agreement. As of that date, Nike understood and took for granted that ASI did not intend to continue to distribute Nike products in the territory. Nike relied on ASI's representation by omission." Neither ASI nor Venrod directly refuted Mr. Pohlen's declaration.

There is nothing in the record before us which suggests that ASI complied with the renewal requirement. In fact, Venrod admitted that ASI failed to give the notice. In a telex to ASI dated December 10, 1985, Venrod stated:

You must bear in mind that Athletic Sales failed to give Nike notice of its intention to extend its contract beyond May 31, 1986 as required by Article 3 of the Distribution Agreement.

This statement by Venrod shows ASI's knowledge of its own failure to provide written notice and helps color the subsequent meetings of the parties not as renewal negotiations as defendants contend, but rather as a way to effect the smooth transition of the parties who were knowingly heading towards the expiration of their contracts.

Regarding the import that can be given evidence concerning only Venrod vis-á-vis ASI's conduct it is important to understand not only the symbiotic relationship between the two, e.g., they shared and continue to share the same personnel and facilities, (see paragraph 7 in factual background supra ), and Nike would ship and bill the merchandise directly to Venrod, but also the fact that ASI itself relies almost exclusively on documentation generated or received by Venrod as evidence to support its assertions and oppositions. The ensuing identity conflict [7] has even tripped ASI into mistakenly attributing to itself several crucial communications made by Venrod to Nike and vice versa. (See ASI's memorandum p. 9). The record is clear that it was mostly Venrod who dealt directly with Nike while ASI apparently slept on its rights and duties. ASI did little, if anything, to assert its continuing interest in the Nike distributorship even to the point that when Venrod expressly reminded ASI of its duty to submit a written notice of intent to renew, ASI maintained its same willful disregard for the whole matter.

Given that ASI and Venrod have an interdependent relationship and have chosen, in their opposition to Nike's motion, to interchangeably use telexes and other documentation generated by one or the other, we will follow suit, especially considering our duty to provide them with all favorable inferences that can be found in the record. Accordingly, we will attribute to one whatever the other said.

ASI has not come forward with actual proof of the required notice in writing and it has also failed to refute Nike's assertion that it was never notified in writing.

ASI did submit a sworn statement by Ovidio Torres, its President, declaring in pertinent part:

That [he] [has] personal knowledge that Nike, Venrod and Athletic Sales were actively engaged in conversations and negotiations for the continuance of the distribution agreement for the years 1986 through 1991 since August 1985 to February 1986, having Nike on December 1985 agreed to continue the distribution agreement.

However, ASI has failed to substantiate its claim of "personal knowledge" of the negotiations between the parties. It may be that ASI's purports to present a factual dispute regarding the parties' understanding and intention during the negotiations ASI claims took place.[8] However, the

---

**7.** In fact, plaintiff has sought to dismiss ASI's bankruptcy petition on the basis that it was made in bad faith because ASI is a "corporate shell" of Venrod's.

**8.** ASI's purported evidence of negotiations *prior* to the October 1, 1985 deadline for written notice is slim at best. It consists of a host of mostly pro forma telex exchanges (many between Nike and Venrod) concerning Nike's an-

facts of this case taken as a whole force us to conclude that the dispute, if any, and as presented to the Court, is not material. As the Court of Appeals stated in a similar context: "We do not think that the principles of Puerto Rico contract law allow a party to defeat a motion for summary judgment by the mere invocation of 'the parties' intention' to introduce an interpretation of the contract totally inconsistent with its clear terms." *Caribbean Ins. Services v. American Bankers Life Assur. Co. of Florida*, 754 F.2d 2, n. 6 (1st Cir.1985). *See also* 31 L.P.R.A. §§ 3372, 3375, and 3471; *Marina Industrial, Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64 (1983).

### Verbal Notice/Equitable Estoppel/Unjust Enrichment

ASI (and Venrod) alleges that it *verbally* gave renewal notice to plaintiff and that Nike, through its actions, accepted the sufficiency of such notice and is therefore now estopped from raising the issue before us.

ASI supports part of its argument of equitable estoppel with inapposite references to landlord-tenant law dealing with unjust enrichment. ASI's circular argument is that though the contract required written notice Nike got verbal notice and that Nike knew of ASI's financial investments in developing a market for Nike, which ASI likens to a tenant's improvements of the premises, so that to permit Nike to enforce the renewal clause would give it a windfall (unjust enrichment).

ASI misconstrues the issue. The protections of Law 75 are not triggered unless there is a valid, existing contract between the parties which the *supplier* unjustly terminates. If there is no contract because the *dealer* knowingly failed to comply with the renewal provisions of the same, then we must stop at the threshold of the Law 75 protected zone and not venture into the dense intricacies of whether or not there was just cause.

Here Nike's main argument is that it did not terminate the contract but rather that it expired by its own terms solely due to ASI (and Venrod's) failure to abide by the renewal requirements in the contract. Both ASI and Venrod retort, with their most relevant argument, that Nike either accepted the notice as given or somehow led them to believe the contract would be renewed. Neither part of that argument is supported by the record.

Defendants' argument that they did not file a written notice of their intention to extend the Distribution Agreement because they were relying on various communications and meetings with Nike is further refuted or belied by the following excerpts of the telexes and letters submitted by the parties.

A. Letter of February 28, 1986 from Nike to ASI and Venrod:

As you requested, I am writing this letter to confirm the points we preliminarily agreed on during our February 27 meeting.

The following points were agreed to:

1. The Distribution Agreement between Nike International Ltd. ("Nike") and Athletic Sales, Inc. ("ASI") will terminate on May 31, 1986....

2. The agreement between Nike, ASI, Venrod and Luis B. González ("trustee"), hereinafter called the Subdistribution Agreement, will terminate on May 31, 1986....

B. Venrod replied to the above letter *three months later* stating in part:

.    .    .    .    .

3. In view that no other alternative or position inconsistent with that already stated and unilaterally adopted by Nike was acceptable and/or subject to negotia-

---

nual sales meeting for Latin American customers held in Acapulco, Mexico during October 15–18, 1985. In addition, Mr. Torres' declaration above that Nike agreed to continue the Distribution Agreement in December 1985 is badly supported with a telex from Nike to Venrod which involves simply and *expressly* changes to the payment terms of the contract.

(*See* Exhibit page 38 attached to ASI's motion). These changes were solely for the contract already in place and arose from payment difficulties Venrod was having with its Nike account as evinced in other telexes Venrod wrote to Nike and filed in the record. No mention of an extension to the contract appears in these documents nor can we infer one.

tion during our meeting, Venrod *was left with no other choice but to discuss several alternatives, on a contingency basis, in the event Nike were to, in fact, notify the termination of our Distribution Agreement.* (Emphasis added.)

We read this statement by Venrod as nothing more than a belated, after-the-fact justification for not replying sooner to Nike's letter. It also shows that Venrod was fully aware that the contract was to expire. The explicitness of Nike's February 1986 letter would have prompted any reasonable dealer who disagreed with its contents to *immediately* respond with clarifications, contentions, etc. Yet ASI *never* responded (and Venrod did so but months later). ASI did nothing but sit and wait until the contract finally expired. We are hardpressed to understand how ASI can argue that it was actively engaged with Nike in renewal negotiations and that it expressed its renewal interest to Nike when all it can point to is: a self-serving, abstract statement by Mr. Torres, a few telexes about an annual sales meeting in Acapulco; telexes between Nike and Venrod mostly dealing with payment difficulties between them, and to nothing more than stone silence on its part.

The record clearly shows that ASI was aware of its duty to file a written notice; that it never, prior to the October 1, 1985 deadline and even for a long period thereafter, expressly showed any interest in the renewal of the contract and that for all practical purposes it left matters entirely to Venrod—a fatal mistake given Venrod's third-string position on this team.

Both Venrod and ASI seem to place vital importance on the February 27, 1986 meeting to which Nike's letter (described above) refers. This meeting, they claim, evinces the parties' attempts to renegotiate the Distribution Agreement. And it is this conduct on the part of Nike, they argue, that should, in equity, preclude it from now seeking protection under the Term Clause (the renewal provisions) of the contract. Stated differently, Venrod and ASI claim that Nike at all times was renegotiating the contract with them making the written

notice requirement a mere and unnecessary formality since all the notice would do is trigger the very same renegotiation meetings that were taking place. Therefore principles of estoppel should prevent Nike from now asserting its right under the Term Clause. But careful scrutiny of the documents in evidence and of defendants' conduct tells a different story. Not only was defendants' position on renewal of the contract equivocal, as Venrod's letters and telexes attest insofar as at one time it expresses a desire to continue relationships with Nike and at another it bids Nike "good riddance," [9] but this position was, on the part of the most important player (ASI), non-existent. To be sure, there is a belated, handwritten letter to Nike (dated 1/23/86 with the signature of the author illegible) where "the principals of Athletic Sales" (a misnomer given that ASI had only *one* officer qua employee) express a concern over the "jeopardy" of the *Sub–Distributor* Agreement and an interest to "continue the agreement." However, this by itself cannot overcome the clear and extensive communications made not only by Nike to ASI but also by Venrod which unequivocally informs ASI that due to the lack of written notice and of any other form of timely correspondence by ASI to Nike, the Agreement would soon expire. The two meetings that occurred after the October 1, 1985 deadline, particularly the February 27, 1986 meeting, had the main purpose of coordinating a smooth "change of the guard" once the contract expired. The record shows that Nike never intended or behaved in any way to make the defendants believe that the meetings were for any other purpose than to effectuate the smooth termination of the contract.

Nike's letter memorializing the meeting and written the day after not only speaks about the expiration of the agreements and the manner in which the last payments and remaining inventory would be handled, but it also reflects that the parties were trying to reach an agreement regarding a half-million dollar debt ASI owed Nike since at least 1984. (In fact, the Distribution and

---

9. *See infra* p. 1245–46.

Sub–Distributor Agreements reveal that Nike insisted that Venrod and a separate trustee be brought into the enterprise with ASI in order to minimize the risk created by ASI's frail financial condition. The intent apparently was to eventually substitute ASI for Venrod as the sole distributor in Puerto Rico.) Nike was willing to forgive the debt in exchange for ASI and Venrod's releases of all Law 75 claims. This we read as nothing more than an astute business decision rather than any concession of liability. Venrod's answer to Nike's letter (here again ASI is nowhere in the picture) though containing language obviously meant to beef-up Venrod's Law 75 position in the face of impending litigation (since Venrod decided than to fight the matter rather than settle), does nonetheless clearly show that Venrod (and we presume the same for ASI) was talking not so much renegotiation as termination and settlement at these meetings.

> The *alternatives or points discussed during our meeting were to be evaluated and consulted internally within our respective Board of Directors*, and as far as I am concerned, there was no preliminary agreement whatsoever on our behalf as to the points mentioned in your letter of February 28. Needless to say, the contents of your letters of February 28th and April 8th seem to state otherwise, giving the incorrect impression that the points mentioned therein "were all agreed to." This indeed is not correct and, once again, absolutely unfair towards Venrod.... (Emphasis added.) In view of the above I must decline your company's proposal stated in your letters of February 28 and April 8, 1986.

(*See* Venrod's letter of May 8, 1986, exhibit 39 attached to ASI's memorandum).

Again, we ask why it took Venrod so long to respond and, more importantly, why ASI never responded? The answer lies not in the defendants' interpretation of the documents in evidence but on the clear language of the same coupled with the conduct of the parties.[10]

Further evidence that ASI and Venrod were preparing to move out of the Nike territory is found in the deposition of Mr. Torres, ASI's President, wherein he reveals that beginning in May 1986 (the date of the expiration of the Nike contract) ASI and Venrod, doing business as VRS, began the process of distributing athletic footwear, particularly the Mizuno brand, in direct competition with Nike—using the expertise, no doubt, that they had gained in their years with Nike. Apparently Mr. Torres was also making it known to certain retail outlets, notably "La Suela de Goma," that ASI and Venrod were no longer Nike representatives. (A copy of the deposition transcript excerpts can be found in Volume II of the record).

This aggressive behavior on the part of defendants together with the size and extensive experience they, particularly Venrod, have in the marketing industry also argues against any implication—for that is all that has been made by defendants—that the Distribution Agreement was a form of adhesion contract imposed by a conniving Nike against the unwitting ASI and Venrod. There is simply no proof in the record to this effect.

What the evidence does show is not that defendants were duped into not filing a written notice of renewal in the belief that they were renegotiating the contract anyway, but rather that all those concerned knew after October 1985 of its impending death and were trying to work out mutual-

---

**10.** What is at issue here, contrary to Venrod's assertions, is not the credibility to be given to the parties' interpretations of the communications they made, but rather if the clear language of the Term Clause should rule the day. To determine that issue we need not consider any parol evidence or engage in any evidentiary hearing which in any case the parties have not requested. What we are showing here, however, is that even considering defendants' arguments of misreliance and estoppel, which we need not do, the same cannot be supported with the instant record. We note, moreover, that to the extent Venrod argues categorically that summary judgment cannot proceed in this case because of alleged issues of interpretation, such is not the case. "[T]he presence of issues involving state of mind, intent, or motivation does not automatically preclude summary judgment." *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 929 (1st Cir.1983).

ly satisfying solutions to pending problems, particularly the remaining Nike inventory and ASI's debt.

In accordance with the above and contrary to ASI's position, there is no evidence, and they have completely failed to cite *any* supporting law, that the principles of estoppel apply to this case. ASI's omission was not caused by any *mala fides* conduct on Nike's part. *See Velilla v. Pueblo Supermarkets*, 111 D.P.R. 585, 588 (1981). Quite the contrary, the failure to give notice was a conscious decision and defendants were fully aware of the consequences of their omissions.

We have engaged in an analysis of defendants' equitable arguments of intention, etc., only to give their position full and fair consideration given the summary judgment posture of this case. And also because we feel the record sufficiently reveals the weakness and even irrelevance of their arguments. Our main holding that the literal terms of the contract and thus the Term Clause control this case precludes our having to consider the conduct of the parties subsequent to the October 1985 deadline for written notice. The reason being, as we have stated, that the provisions of the contract are unambiguous and thus the literal terms must be enforced. Also, since this contract is an integrated agreement— no parol evidence can be admitted. *See* Puerto Rico R. of Evid. 69(B) (1979). *See also Chavez v. Corp. de Crédito de Isabela*, 103 D.P.R. 892 (1975). When in a written agreement all terms and conditions constituting the true and final intention of the parties have been included, then such an agreement is considered complete and, generally, there can be no evidence extrinsic to its contents. Here not only did the contract contain this integrated agreement provision, it also provided that no terms could be waived, changed or otherwise modified except in writing and signed by the party against whom the waiver, change, or modification was to be enforced. *See* paragraph 20 of the Distribution Agreement. In the present case there was no written notification and no written and signed modification of the contract that can do away with that requirement. Therefore, the contract properly expired on the date the parties had originally negotiated. In short, the paucity of defendants' evidence has emptied their claims of significance which no legal alchemy can restore.

## Clear Terms of the Contract

Paragraph 20 of the Distribution Agreement provides:

*Entire Agreement; Consultation by the parties; Attorneys Fees.* A. The signatures of the parties set forth below are their acknowledgement that this Agreement sets forth their entire understanding and agreement and supersedes any and all negotiations between DISTRIBUTOR and NIKE. With respect to the subject matter of this Agreement; there are no representations or promises between the parties hereto except the set forth herein. No provision of this Agreement may be waived, changed, terminated, modified or discharged, orally or otherwise, except in writing, signed by the party against whom such waiver, change, termination, modification or discharge is sought to be enforced.

In view of the above-cited paragraph, the requirement that ASI notify Nike on or before October 1, 1985 of its intention to extend the term of the Distribution Agreement could not be waived, changed or otherwise modified, unless in writing and agreed upon by Nike. As we have mentioned, there was no notice set forth in writing, let alone signed and agreed by Nike. Therefore, ASI's argument of verbal notice is of no consequence. Moreover, even Venrod admitted in its answer to Nike's Request for Admissions dated June 2, 1986 that it had not given the required notice. Nike's request for admission number 3 reads:

Admit that Venrod did not in fact notify Nike in writing of its desire to extend the duration of the Distribution Agreement, on or before October 1st, 1985.

Venrod's response dated July 31, 1986 states:

3. Admitted. However, Venrod was not required, to do so, and furthermore had no contractual obligation in connection

thereto for the reasons stated in request for admission number two (2) above.

Venrod's answer to request number two (2) above further provides:

> Venrod han (sic) no contractual obligation to notify Nike of its desire to extend the duration of the Sub–Distribution Agreement as stated in under request for admissions number one (1) above.

Thus, by Venrod's own admission it was ASI's responsibility to notify Nike of its intention to renew the Agreement. And although Venrod now seems to confess and avoid by stating that it had no duty to submit written renewal notice and then pointing to its status as *de facto* principal co-distributor and the "man-in-charge," it seems clear to us that both Venrod and ASI were aware of the duty to give Nike written notice and that ASI consciously decided not to, and Venrod consciously decided not to influence ASI do so either (which it well could have done given its close relationship to ASI).

In light of the clear provisions of the Distribution Agreement we find that ASI's self-serving claim of an intention to renew is totally inconsistent with the terms of the Distribution Agreement and with ASI's own omissions. ASI cannot in this manner defeat Nike's well-founded motion for partial summary judgment. *See* citations at pp. 1247–48, *infra.* To hold otherwise would be tantamount to permitting ASI to take this case to trial with unsupported denials and unfounded counterclaims. In any event, there is no ambiguity in the contract's terms requiring that the intention of the parties be inquired into.

Puerto Rico law limits the freedom to contract only in circumstances that violate the law, morals or public policy. 31 L.P.R.A. §§ 4, 3372, 3421; *Grissom v. Colotti,* 644 F.Supp. 903, 905 (D.P.R.1986). Otherwise contracts must be fulfilled according to their stipulations pursuant to the codified doctrine of *pacta sunt servanda* (agreements must be respected). 31 L.P.R.A. § 2994; *Casera Foods, Inc. v. E.L.A.,* 108 D.P.R. 850 (1979).

Once a contract is perfected, as in the present case, 31 L.P.R.A. 3375, the parties must abide in good faith by all of its terms. In addition, the literal sense of the contract's language prevails if the terms are clear. 31 L.P.R.A. § 3471. Any general terms in a contract should not be interpreted as inclusive of things and cases different from those intended. That intent, once again, is to be gleaned first from the literal terms of the contract and then, if necessary, from the circumstances surrounding its execution. Here, ASI admits that the contract language is clear and that it controls the present issues. In its words, "the documents (Agreements) speek (sic) for themselves." (ASI's memorandum in opposition at p. 12).

Neither can a series of telexes submitted by ASI overcome the motion before us. A telex dated November 18, 1985, more than a month after the deadline, written by Venrod and addressed to Nike, *not ASI,* can only, at best, establish that *Venrod* intended to renew its agreement *with ASI*—an agreement which was clearly subordinate to, and dependent upon, the existence of the Distribution Agreement between Nike and ASI. *See* paragraph 24 of the Sub–Distributor Agreement and discussion on pp. 1246–47, *infra.* Nothing is said, however, in that telex about renewing the main Distribution Agreement. Finally, even assuming Venrod's telex had been submitted by the proper party, i.e., ASI, it cannot be deemed to constitute a bilateral written modification of the Distribution Agreement, as Nike did not subscribe to such document as required by paragraph 20 of the Distribution Agreement.

In fact, all the telexes filed as exhibits in this case when read together directly contradict the position ASI and Venrod are now assuming. For example, a telex written by Waldemar Rodriguez, President of Venrod, to Nike and dated January 10, 1986 [11] provides in pertinent part:

> Undoubtedly, we are heading towards the termination of our agreement....

---

**11.** This telex was submitted by Nike and is attached to Nike's December 22, 1987 "Motion

Filing Exhibits and Certifying Services." (docket No. 44.)

In my years of doing business I have never experienced a relationship as non-rewarding as the one we have had with you. So, for us, good riddance.

We expect to continue representing your company until approximately August, when we will have fullfilled our actual compromises and when hopefully you will have a new distributor and agent.

The language in Venrod's telex, thus, is not evidence of ASI's intention to extend the Distribution Agreement nor of ASI's intention to renew. On the contrary, the telex simply demonstrates Venrod's own acceptance and admission of the fact that the contractual performance could not extend much beyond the expiration of the Distribution Agreement and that Venrod itself, as distributor, was aggressively pondering and, we might add, looking forward to, the termination of the contract. Since Law 75 does not speak to distributors unilaterally ending their distribution contracts, then Venrod (and ASI) was free to do exactly that. The telex does help, however, to impute to ASI knowledge that the contract would expire for lack of written notice to renew. This leads to the inescapable conclusion that ASI deliberately chose to let the contract die a natural death.

### The Sub–Distributor Agreement

■ Having determined that the Distribution Agreement expired by its own terms on May 31, 1986, it follows that the Sub–Distributor Agreement also expired on that date.

Paragraph 2[12] of the Sub–Distributor Agreement provides:

ATHLETIC SALES hereby appoints VENROD its exclusive sub-distributor for the sale, advertising and distribution of athletic shoes, apparel and bag under the NIKE, WING Design and other name trademarks used by NIKE, under the same terms and conditions of ATHLETIC SALES' Distribution Agreement

with NIKE of even date herewith, a copy of which is attached hereto as Exhibit 1, said appointment to be effective for a term of seven (7) years from the date hereof *provided* the NIKE Distribution Agreement is also in effect for a similar term. (emphasis supplied).

It is clear then that the existence of the Distribution Agreement was a condition precedent for the continuation of the Sub–Distributor Agreement. The Sub–Distributor Agreement depended on the Distribution Agreement and once the latter ceased to exist so did the former.

Venrod knew or should have known that the Distribution Agreement was for a term of two (2) years.[13] Venrod also knew that its appointment as ASI's sub-distributor was entirely conditioned upon the existence of the agreement between ASI and Nike. Similarly, Venrod knew of the required notice provided in paragraph 3 of the Distribution Agreement. However, like ASI, Venrod chose not to give the required notice prior to October 1, 1985. Admittedly, Venrod was not a signatory to the Distribution Agreement and therefore it was incumbent upon ASI, not Venrod, to provide the required notice. Nonetheless, the record shows that Venrod was clearly aware of ASI's non-compliance with the renewal terms and the effect thereof—particularly as to the continued validity of Venrod's own sub-contract. But rather than "cover all bases" and notify Nike of an intention to renew, Venrod expressed during the relevant time, in both actions and omissions, an unwillingness to continue the relationship.[14] Again, Nike cannot be held responsible for ASI's non-compliance with the terms and provisions of the Distribution Agreement.

In addition, the documentary evidence presented by the parties completely fails to support the defendants' arguments that they were misguided by Nike. Nike's early

---

**12.** *See also* paragraph 7 of Venrod's counterclaim where this language is essentially repeated though not directly quoted.

**13.** We note that Venrod is mentioned in the Distribution Agreement and that both agreements were executed on the same day.

**14.** *See, e.g.,* portion of Venrod's January 10, 1986 telex to Nike discussed in pp. 1245–46 *supra.*

messages were clear—the distribution relationship was moribund. The defendants' responses, especially ASI's telltale silence, were equally clear—they were alternatively seeking a safe way to get out of the relationship or a way to impose their status beyond the realm of the contract's term. Whatever their intentions, their arguments today would carry more weight if ASI had simply complied with the necessary and unambiguous requirement of notice it had agreed to in the first place (when it executed the contract). Consequently, both Venrod and ASI are barred from claiming any damages resulting from the expiration of the Distribution Agreement and the Sub–Distributor Agreement. Their counterclaims must be dismissed.

### Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

In determining whether or not summary judgment is appropriate, the Court must look at the record in the light most favorable to the party opposing the motion, and indulge all inferences favorable to that party. *Stepanischen v. Merchants Dispatch Transp. Corp.*, 722 F.2d 922, 928 (1st Cir. 1983); *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976).

Since "the purpose of summary judgment is not to explore all the factual ramifications of the case, but to determine whether such exploration is necessary," *Briggs v. Kerrigan*, 431 F.2d 967, 968 (1st Cir.1970), the party opposing the motion may not rest on the mere allegations or denials of his pleading, but, setting forth specific facts, Fed.R.Civ.P. 56(e), must establish the existence of an issue of fact which is material, i.e., affects the outcome of the litigation, and genuine. A material issue is genuine if it is established by sufficient evidence supporting the claimed factual dispute to require a judge or jury to resolve the par-

ties' differing versions of the truth at trial. *Hahn*, 523 F.2d at 464. Put another way, the dispute is genuine if reasonable persons could differ about the issues in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Boston Five Cents Savings Bank v. Secretary of H.U.D.*, 768 F.2d 5, 8 (1st Cir.1985); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Nonetheless, the mere existence of some alleged factual dispute between the parties will not defeat a properly supported summary judgment motion. The requirement is that there be no *genuine* issue of *material* fact. *Anderson* 106 S.Ct. at 2510; *see Kennedy v. Josephthal & Co., Inc.*, 814 F.2d 798 (1st Cir.1987); *Palhava de Varella—Cid v. Boston Five Cents Savings*, 787 F.2d 676 (1st Cir.1986).

If there is no genuine dispute as to the material facts of the case then no further exploration of the facts beyond the record is necessary. *Hahn*, 523 F.2d at 464. In the present case there are no factual issues to resolve before the legal issues can be decided.

To survive Nike's motion for summary judgment, ASI and Venrod must establish that the issue of the renewal notice required in the Distribution Agreement merits trial.

After viewing the record in the light most favorable to defendants, *see Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), we find that there is no genuine issue as to ASI's failure to extend the term of the Distribution Agreement in the manner specified therein which is the crucial fact in this case. The evidence presented in the opposing papers is of insufficient caliber or quantity to allow a rational finder of fact to find that Nike received notice as required by the Distribution Agreement or that Venrod or ASI misrelied on Nike's conduct in not renewing the contract. *Anderson*, 106 S.Ct. at 2511. Worded differently, Nike is entitled to judgment as a matter of law because there can be no factual dispute that the loss of the Distri-

bution and Sub–Distribution Agreements was the result of ASI's own deliberate omissions.

### CONCLUSION

Nike was under no obligation to continue the distribution relationship absent written notice. ASI failed to provide this notice. Therefore, there was no breach of the contract and as a matter of law both the Distribution Agreement and the Sub–Distributor Agreement expired on May 31, 1986. Nike cannot incur in any liability to either ASI or Venrod since by their own omissions they prompted the expiration of their respective appointments. Consequently, Nike is entitled to the declaratory relief it seeks and defendants' counterclaims must be dismissed.

Specifically, we hereby rule on plaintiff's Motion for Partial Summary Judgment filed on September 17, 1987 (docket No. 33) as follows:

1. GRANT the first claim for relief in the complaint to the effect that the Distribution and Sub–Distributor Agreements expired on May 31, 1986;

2. GRANT the second claim for relief and hereby DISMISS ASI and Venrod's counterclaims under Law 75;

3. DISMISS the third claim for relief insofar as it is based on the "just cause" provision of Law 75 which for the reasons explained above need not be reached by this Court given our adjudication of the rest of the complaint;

4. DISMISS the fourth claim for relief seeking that Law 75 be declared unconstitutional (*see* footnote 1 *supra* at p. 1236); and

5. Stay proceedings with respect to the fifth claim for relief regarding Nike's collection of $452,218.86 allegedly owed by defendants. Since ASI is an indispensable party to this issue and since it is in bankruptcy, we will stay collection proceedings against Venrod pending the Bankruptcy Court's determination of the issues before it which are relevant to our case. Copy of this Order shall be notified to the Bankruptcy Court forthwith.

Partial judgment shall be entered accordingly.

IT IS SO ORDERED.