EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Banco Popular de Puerto Rico<br>Recurrido<br><br>v.<br><br>Sucn. Talavera t/c/c Rita Talavera Taylor t/c/c Rita Talavera de Taylor y otros<br>Peticionario | Certiorari<br><br>2008 TSPR 132<br><br>174 DPR \_\_\_\_ |

Número del Caso: CC-2004-922

Fecha: 31 de julio de 2008

Tribunal de Apelaciones:

        Región Judicial de San Juan Panel IV

Abogado de la Parte Peticionaria:

        Lcdo. Orlando Collado Medina
        Lcdo. Manuel Reyes Davila

Abogado de la Parte Recurrida:

        Lcdo. Eyck O. Lugo Rivera
        Lcdo. Sadi R. Antonmattei Goitía
        Lcda. Leila Castro Moya
        Lcdo. Alberto Rodríguez Ramos

Materia: Cumplimiento Específico de Contrato y Consignación de Fondos.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Banco Popular de Puerto Rico
        Recurrido

              v.

  Sucn. Talavera t/c/c Rita          CC-2004-922   *Certiorari*
  Talavera Taylor t/c/c Rita
  Talavera de Taylor y otros
        Peticionaria

Opinión del Tribunal emitida por la Jueza Asociada SEÑORA FIOL MATTA

En San Juan, Puerto Rico, a 31 de julio de 2008.

Resolver la controversia que presenta este recurso requiere que nos expresemos sobre los límites a la exigibilidad de las obligaciones contractuales y el alcance de la buena fe como generadora de deberes y como marco ético-moral del comportamiento debido en todas las etapas de la relación contractual.

I

El 5 de noviembre de 1973, el Banco Popular de Puerto Rico (en adelante, BPPR) adquirió por cesión de Commonwealth and Internacional Mortgage Corporation (en adelante, Commonwealth), y por el precio de $86,493.87, un contrato de arrendamiento

con cláusula de opción de compraventa de un solar con cabida de 779 metros cuadrados en la Urb. Reparto Sullana de San Juan. El contrato de arrendamiento suscrito el 4 de junio de 1968 entre Commonwealth y la dueña del solar, señora Rita Talavera tenía un término de duración de 25 años con un canon mensual de $8,000.00. Al concluir el término pactado, el arrendatario tendría derecho a ejercer su opción de compraventa con el pago de $10,000.00; el precio de compraventa pactado era $22,500.00.

El 24 de enero de 1983 la señora Talavera, quien era ama de casa y residía fuera de Puerto Rico, envió una carta al Vicepresidente Ejecutivo de Inversiones Internacionales, Inc. En lo pertinente, dicha comunicación lee como sigue:

> Hace catorce años que tuvimos el pace [sic] de conocerlos en nuestro hogar en El Paso, Tejas; mi esposo William Taylor y yo, cuando arrendé a ustedes el solar que tengo en Puerto Nuevo, Avenida Roosevelt en el cuál [sic] el Banco Popular construyó un edificio.
>
> Según el contrato de arrendamiento es un período de veinticinco (25) años a razón de $8,000.00 anuales. Al final de los veinticinco años ustedes me pagarán $30,000.00 y el solar pasaría a la propiedad de Inversiones Internacionales, ó [sic] al Banco Popular según el contrato.
>
> Mi esposo murió hace seis meses y ahora más que nunca antes de esperar hasta 1993 cuando termina el contrato; cuando yo posiblemente no esté aquí y pasaría a mis herederos indirectos; o si yo estoy, estaría muy mayor de edad para serme de alguna utilidad, le agradecería si es posible para ustedes me adelantaran los

> $30,000.00 ahora y seguir pagándome los $8,000.00 anuales según el contrato hasta el término indicado o se a hasta el 1993.
>
> También les agradeceré me aconsejen en cuanto a la posibilidad de rebajar la cantidad de contribución sobre ingresos a pagarle al gobierno de P.R., si lo que le propongo fuera posible. Hace muchos años que estoy fuera de P.R. y mi esposo no esta [sic] aquí para asesorarme; así es que realmente dependo de usted y su buena fé [sic] en este caso.

La señora Talavera falleció en mayo de 1985, pero el BPPR continuó pagando los cánones de arrendamiento hasta el 27 de mayo de 1993, cuando venció el contrato. Poco antes le había notificado a los herederos su intención de ejercer su derecho de opción, pero la sucesión se negó a otorgar la escritura. Por consiguiente, el BPPR presentó una demanda contra la sucesión el 19 de mayo de 1994 reclamando el cumplimiento específico del contrato, en particular la cláusula de opción de compraventa. Asimismo, depositó en el tribunal el precio de compraventa pactado. La sucesión alegó que la cláusula era nula por ausencia de causa. Por existir una desproporción entre las contraprestaciones, alegaron que se justificaba la resolución de la cláusula de compraventa o la intervención modificadora del tribunal. Así, solicitaron la aplicación de la cláusula *rebus sic stantibus*, ya que para un lego era imprevisible el incremento de valor de la propiedad objeto del contrato en un período de 25 años.

Luego de varias mociones de ambas partes pidiéndole al tribunal que resolviera el caso por sentencia sumaria,

el tribunal de instancia celebró una vista en la que se le presentaron informes sobre las implicaciones económicas del contrato en controversia y las tasaciones del valor del inmueble objeto del contrato. Específicamente, en 1993, el valor del inmueble fluctuaba entre $312,000.00 y $497,000.00. El 26 de enero de 1998, el Tribunal de Primera Instancia dictó sentencia sumaria por no haber controversia sobre los hechos materiales del caso y así determinó que el precio de compraventa pactado en 1968 representaba entre el 4% y el 7% del valor real del inmueble a la fecha de la sentencia. Por considerar que estaban presentes circunstancias extraordinarias procedió a aplicar la cláusula *rebus sic stantibus*.

El Tribunal de Primera Instancia señaló que el otorgar contratos de opción de compra con una extensión de tiempo como la que se pactó en este caso no es la práctica en la compraventa entre particulares en Puerto Rico como tampoco en la industria bancaria. Ello porque las tasaciones de las propiedades no tienden a tener vigencia más allá de los seis meses. Además, el tribunal expresó que:

> un contrato de opción con compra por un término tan largo como de 35 [sic] años, sin que contenga un sistema para revisar el precio, es algo insólito extremadamente perjudicial para la arrendadora e inaceptable aún con el más mínimo asesoramiento legal. Solamente personas incautas e ignorantes entran en este tipo de negociación.

En atención al conocimiento especializado de los bancos y considerando que la falta de asesoramiento puso

a la señora Talavera en un estado de indefensión, el Tribunal de Primera Instancia determinó que el cambio tan drástico en el valor de la propiedad con el pasar los años no era previsible y derrotó la voluntad de contratar de la señora Talavera. Al no poderse concluir que la señora Talavera tuviera la intención de donar entre el 93% y el 96% del valor de su propiedad ni que existiera alguna otra causa válida para traspasar la propiedad del inmueble por un precio a todas luces irrisorio, el tribunal moderó el contrato. Dispuso que no había obligación de aceptar el precio pactado en el contrato original, pero que si el BPPR aún interesaba adquirir el solar, las partes deberían llevar a cabo negociaciones en un período de sesenta días para acordar un precio de compraventa justo o el tribunal señalaría vista a tales efectos.

Inconforme, el BPPR recurrió al Tribunal de Apelaciones alegando que el Tribunal de Primera Instancia no debió haber intervenido con el contrato y que había errado al no ordenar su cumplimiento específico. El 31 de diciembre de 2003, el Tribunal de Apelaciones revocó la determinación del foro de instancia fundamentando su decisión en que el aumento en valor de una propiedad era previsible. El Tribunal de Apelaciones explicó:

> En cuanto a la doctrina *rebus sic stantibus*, no se justifica su aplicación a la controversia de autos ya que falta uno de los factores, el carácter de imprevisibilidad. Una persona de razonable inteligencia puede o debió prever, que en una isla con limitados recursos de espacio

> y en pleno desarrollo, el valor de las propiedades a través del tiempo aumenta. Más aún, es de todos conocidos que el desarrollo del área donde se encuentra ubicado el terreno es uno de alto crecimiento. Como mencionáramos antes, al contratar se asume el riesgo de que las circunstancias cambien y dentro del concepto *pacta sunt servanda* las partes tienen oportunidad suficiente para proteger sus intereses en forma que estimen adecuada.

Luego de varios incidentes procesales, la sucesión Talavera recurrió ante nosotros alegando, entre otras cosas, que el Tribunal de Apelaciones había errado al determinar que no se justificaba la intervención moderadora del Tribunal de Primera Instancia y al no aplicar la cláusula *rebus sic stantibus*. Expedimos el auto de *certiorari* y con el beneficio de los escritos de las partes, pasamos a resolver.

## II

La teoría de los contratos se funda sobre la base de la autonomía de la voluntad y la libertad que tienen las partes contratantes de "establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público." Art. 1207 del Código Civil, 31 L.P.R.A. sec. 3372. El principio contractual de *pacta sunt servanda* establece la obligatoriedad del contrato según sus términos y las consecuencias necesarias derivadas de la buena fe. Arts. 1044 y 1210 del Código Civil, 31 L.P.R.A. secs. 2994 y 3375.

Esta autonomía de la voluntad que establece el Código Civil está estrechamente entrelazada con el principio de la buena fe contractual.  En primer lugar, la buena fe obliga más allá de lo expresamente pactado, para abarcar "todas las consecuencias" que por la naturaleza del contrato "sean conforme a la buena fe, al uso y a la ley". 31 L.P.R.A. sec. 3374.  En segundo lugar, un contrato que sea contrario a la ley o la moral o que lesione un interés general de orden jurídico carece de causa.  Art. 1227 del Código Civil, 31 L.P.R.A. sec. 3432[1]; Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 172, 182 (1985); Cf. Velilla v. Pueblo Supermarkets, 111 D.P.R. 585, 588 (1981).

El artículo 7 del Código Civil permite a los tribunales resolver conforme a equidad, "[teniendo] en cuenta la razón natural de acuerdo con los principios generales del derecho y los usos y costumbres aceptados y establecidos." 31 L.P.R.A. sec. 7. A través de la equidad, el ordenamiento da lugar a excepciones y permite atemperar la rigurosidad de las normas cuando, por sus términos absolutos, se produce una injusticia en una situación particular.  Así, Puig Brutau reconoce que, si bien no debe extrañar que se haya definido la obligatoriedad del contrato a partir de la teoría voluntarista, "tampoco ha de extrañar que en torno a su

---

[1] Específicamente, el artículo 1227, supra, dispone lo siguiente: "Los contratos sin causa, o causa ilícita, no producen efecto alguno.  Es ilícita la causa cuando se opone a las leyes o a la moral."

concepto se hallen agrupadas reglas que extienden, restringen o incluso nieguen la eficacia del contrato como debido a un acto de voluntad." II-I J. Puig Brutau, Fundamentos de Derecho civil, Tercera edición, Editorial Bosch, Barcelona, pág. 17. De la equidad romana surge en el ámbito del derecho contractual la llamada cláusula o condición *rebus sic stantibus et aliquo de novo non emergentibus*. Puig Brutau, *op. cit.*, pág. 353.[2] Aunque no aparezca expresamente en las codificaciones, los sistemas civilistas la han reconocido como corolario a diversos principios de la teoría general de las obligaciones y contratos, como la buena fe, el abuso del derecho y la equidad contractual. Casera Foods, Inc. v. E.L.A., 108 D.P.R. 850, 855 (1979). Como una condición implícita y sobreentendida en la contratación, esta doctrina parte del supuesto que los contratos de tracto sucesivo o de cumplimiento aplazado obligan mientras no ocurran cambios importantes en el estado de hechos contemplado por las partes al momento de contratar. *Íd*. Se ha dicho que el fundamento de la cláusula *rebus sic stantibus* se encuentra precisamente en la libre voluntad de las partes y así, incide sobre la exigibilidad de los contratos. En particular, Augusto Pino expone que:

---

[2] *Contractus qui habent tractum succesivum vel dependentia de futuro rebus sic stantibus intelligumtur*. En palabras de Puig Brutau, "…Todo contrato cuya eficacia se proyecta en el futuro, se considera celebrado con la condición implícita que las cosas han de permanecer así" Puig Brutau, *op. cit.*, págs. 353-354.

> La antigua máxima *voluntas non fertur ad incognitum*, que antiguamente se requeriría para justificar el valor atribuído [sic] a la *cláusula* sólo tiene la significación de precisar que la voluntad no se extiende a cuanto, por ser desconocido, no podía ser objeto de sus determinaciones, pero que puede entenderse en el sentido de que el producirse y el perdurar, de los efectos jurídicos, estén ligados a la constante voluntad de las partes. Augusto Pino, La excesiva onerosidad de la prestación, traducción y notas al derecho español de Federico de Mallol, Editorial Bosch, Barcelona, 1959, pág. 136.

Conforme al principio de la equidad, la cláusula *rebus sic stantibus* atempera la inflexibilidad y severidad del principio de *pacta sunt servanda* recogido en el artículo 1044, *supra*, y le permite al tribunal intervenir en aquellos contratos en los que se laceraría la buena fe o se causaría una injusticia al obligar a su cumplimiento específico.

Es importante destacar que la buena fe contractual no se manifiesta tan sólo al comienzo del contrato o en la fase negocial, sino que está presente mientras dure la relación contractual. Asimismo, las partes "deben adoptar un comportamiento leal en toda fase previa a la constitución de tales relaciones… [y] deben también comportarse lealmente en el desenvolvimiento de las relaciones jurídicas ya constituidas entre ellos." Díez-Picazo, Prólogo en Wieacker, El principio general de la buena fe, Editorial Civitas, Madrid, 1982, pág. 12.[3]

---

[3] Según Díez-Picazo, los intentos de modernizar la doctrina de la cláusula *rebus sic stantibus* han resultado insatisfactorios y "no puede hablarse en sentido riguroso de una verdadera "cláusula". Los efectos jurídicos que

La obligatoriedad e irrevocabilidad del contrato es de suma importancia para la estabilidad de las negociaciones y las relaciones económicas. Sin embargo, cuando ocurren circunstancias que alteran la base sobre la cual las partes confiaron al obligarse, hay justificaciones mayores que surgen de los principios generales del derecho para permitir la modificación o extinción del contrato.

La buena fe, según señalamos en Producciones Tommy Muñiz v. COPAN, 113 D.P.R. 157 (1989), impone un arquetipo de conducta social que implica la carga de una lealtad recíproca de conducta valorable y exigible. En virtud de esta exigencia de lealtad, el contenido de la buena fe necesariamente rebasa "el mero actuar correctamente", particularmente dentro del marco de la

---

la modificación de las circunstancias producen en la relación contractual no tienen su origen ni su fundamento en una voluntad real o presunta de las partes". Así explica:

> [La doctrina de la cláusula *rebus sic stantibus*] trata de encontrar su fundamento en una implícita voluntad de las partes de insertar en su contrato una cláusula semejante, que es considerada por esto como una cláusula implícita o sobreentendida. Sin embargo, parece clara que toda relación entre la voluntad de las partes y los efectos que deba producir la alteración sobrevenida de las partes es ficticia. Es posible que una contemplación de las circunstancias y una voluntad implícita respecto de ellas se haya producido, pero es claro también que existen circunstancias que son objetivamente necesarias para el desarrollo de la relación contractual y respecto de las cuales su modificación o su alteración repercute en la vida del contrato cualquiera que haya sido la real voluntad de los otorgantes de la misma. Díez-Picazo, Fundamentos del Derecho civil

relación contractual. Por eso, la buena fe contractual no debe manifestarse tan sólo al comienzo del contrato o en la fase negocial, sino mientras dure la relación y necesariamente será matizada por el comportamiento recíproco de las partes contratantes. Asimismo, en Colón v. Glamorous Nails & Boutique, Inc., et al., 2006 T.S.P.R. 16, entramos en el aspecto moral y ético de la buena fe y el carácter primordial en todas las etapas de la relación contractual y citamos a Puig Brutau para recalcar que esta relación "impone determinados deberes, en el sentido de estar las partes obligadas a comportarse con la buena fe necesaria y a observar la lealtad exigida por las convicciones éticas imperantes". Puig Brutau, *op. cit.*, pág. 216. Explicamos entonces que al establecer la buena fe como principio rector del ordenamiento jurídico se persigue, en palabras de Díez-Picazo, "que el desenvolvimiento de las relaciones jurídicas, el ejercicio de los derechos y el cumplimiento de las obligaciones, se produzca conforme a una serie de principios que la conciencia jurídica considera necesarios, aunque no hayan sido formulados." (Énfasis suplido.) Colón v. Glamorous Nails, supra, citando a Díez-Picazo, La Doctrina de los actos propios, Barcelona, 1963, pág. 157.[4]

---

patrimonial, Editorial Tecnos, Madrid, Segunda edición, 1983, pág. 879.

[4] Las normas ético-sociales pueden ser normas jurídicas vinculantes si nutren el concepto detrás de los principios generales del derecho que imperan a través de

Sobre la importancia del principio de la confianza, Díez-Picazo opina que ésta guarda estrecha relación con la buena fe, pues la confianza "es la raíz última de la expresión *fides*… Lo cual significa que el contratante que formula pretensiones con base en la buena fe tiene que haber tenido previamente confianza en que las cosas serían del modo que él las pretende después." Aclara que "tiene que ser una confianza objetiva y razonable, que, al mismo tiempo, resulte conocida de la otra parte." Fundamentos del Derecho civil patrimonial, Thompson

---

todo el ordenamiento. Por tanto, la protección de la confianza, el deber de actuar de buena fe, el no avalar el abuso del derecho y la prohibición del ejercicio antisocial de éste son normas morales que recoge cada ordenamiento jurídico según los valores sociales imperantes. Wieacker, *op. cit.*, pág. 37. Según Wieacker, "la ética social puede perfectamente establecer máximas *hic et nunc*, esto es, líneas directrices de la conducta social… [Sin embargo] '[b]uena fe' o 'buenas costumbres' no son moldes acabados que el juez calca sencillamente sobre el material que ha colocado debajo, sino una extraordinaria tarea que tiene que realizar el propio juez en la situación determinada de cada caso jurídico." *Íd.* Wieacker señala el parágrafo 138 BGB como una de las cláusulas generales del código alemán que constituye una norma positiva que remite a normas de conducta ético-sociales. En particular, dicho parágrafo dispone que será nulo el negocio jurídico que atente contra las buenas costumbres y "en especial nulo un negocio jurídico por el cual alguien, explotando la necesidad, la ligereza o la inexperiencia de otro, se haga prometer o se procure para sí o para un tercero, a cambio de una prestación, una ventajas patrimoniales que sobrepasen de tal forma el valor de la prestación, que según las circunstancias estén en manifiesta desproporción con dicha prestación". *Íd.* Igualmente el parágrafo 242 del BGB, cónsono con el artículo 1210 de nuestro Código Civil, sirve de ejemplo para ilustrar una norma ético-social en el ámbito de la contratación que impone un deber moral de cumplir con la

prestación debida como exigen la buena fe y las costumbres. *Íd.*

Civitas, Sexta edición, 2007, pág. 67.[5] Ambos principios son imperativos contractuales de gran contenido ético. Además, "el principio de la confianza—al igual que el de buena fe—*cubre toda posibilidad contractual* y, por tanto, no sólo el tronco mismo del contrato, sino también el período anterior y el posterior". (Énfasis en el original.) Rezzónico, *op. cit.*, pág. 377.[6]

El profesor Godreau, en su artículo <u>Lealtad y buena fe contractual</u> discute el tema de la confianza mutua

---

[5] Díez-Picazo abunda en el tema de la moralización de las relaciones económicas reconociendo una marcada tendencia dentro el derecho privado que, "paralelo con la superación del literalismo en la interpretación, propugna la introducción de corrientes de moralización en los negocios jurídicos con el fin de impedir resultados que de otra manera se consideran contrarios a los postulados de la justicia". Díez-Picazo, I <u>Fundamentos de Derecho civil patrimonial</u>, Thompson Civitas, 6<sup>ta</sup> ed., 2007, pág. 59. Específicamente, reconoce la introducción de conceptos morales como límites de la autonomía de la voluntad, la potenciación del requisito de la causa y sobretodo, el principio de la buena fe. *Íd.* Más adelante afirma que "la buena fe no es un instrumento para buscar la verdadera voluntad, sino una manifestación de la responsabilidad objetiva de la conducta negocial". Díez-Picazo, *op. cit.*, pág. 64.

[6] "Se ha sostenido doctrinalmente, el principio de confianza—que domina todo el campo de los contratos, aunque su alcance es mucho mayor— al igual que la libertad contractual y la buena fe, son principio de *orden público* porque—dice Engel—'la colectividad tiene un interés mayor en la conservación y la promoción de los fines éticos del derecho realizados por esos principios'". (Énfasis en el original.) Rezzónico, *op. cit.*, pág. 404. En nota al calce, Rezzónico sostiene que "sin duda se resguardan los intereses esenciales de la sociedad preservando la confianza—que es la base del contrato…" Rezzónico, *op. cit.*, pág. 404, n. 89.

entre las partes en una relación contractual. En particular expresa que "es el *conocimiento* de las expectativas legítimas que la otra parte puede tener, lo que justificará la imposición del deber de *lealtad*." (Énfasis en el original.) Godreau, *op. cit.*, pág. 380. Añade que el contenido que se le pueda dar al trato leal debido en una relación particular tendrá que derivarse "de las convicciones comunitarias que estén a la altura de nuestros tiempos en el momento histórico en que se dilucida la controversia… [y] tener como norte aquellos valores morales que propenden a la verdadera convivencia social y por los cuales debe orientarse la vida en nuestro país."  Godreau, *op. cit.*, pág. 381. Finalmente, cada relación se debe evaluar individualmente a la luz de las circunstancias particulares de cada caso, como por ejemplo, la naturaleza de la relación y las cualidades de las partes contratantes. Godreau, *op. cit.*, pág. 382-383.

La necesidad de evitar la injusticia que puede resultar del aferrarse a ultranza al principio de *pacta sunt servanda* contrario a los postulados de la buena fe ha resultado en diversas doctrinas en los ordenamientos de derecho civil, todas ellas enfocadas en plasmar la coherencia teórica que subyace al principio de *rebus sic stantibus* y superar las dificultades en su aplicación. Han surgido de esta forma las doctrinas de la "imprevisión" en Francia, la "base del negocio" en Alemania, y la "excesiva onerosidad" en Italia.

En el Derecho francés, la modificación del contrato por alteración a las circunstancias no se aceptó en la jurisprudencia civil, pero halló terreno fértil en la jurisprudencia administrativa en el concepto de la "imprevisión", según la cual, "el interés general exige que en contratos de tracto sucesivo el empresario esté económicamente en situación de mantener sin interrupción sus prestaciones". Puig Brutau, *op. cit.*, pág. 362; Planiol-Ripert, 6 Tratado práctico de Derecho civil francés, Editorial Cultural, Habana, 1936, pág. 563-564.[7] La legislación francesa de 1918, conocida como la ley Falliot, autorizó la resolución de ciertos contratos mercantiles anteriores al 1914 cuando su cumplimiento ocasionare a una parte daños o perjuicios desproporcionados. Ripert, La règle morale dans les obligations civiles, Paris, 1949, pág. 154. Interpretando la autonomía de la voluntad a tenor con las condiciones existentes al momento en que los contratantes se obligaron, la teoría de la imprevisión desarrollada por el *Conseil d'État* plantea que obligar al cumplimiento de un contrato, habiendo sobrevenido cambios extraordinarios que las partes no tuvieron en cuenta,

---

[7] Larenz resume esta dicotomía en la doctrina francesa afirmando que el Derecho francés está más dispuesto a "tolerar una injusticia… que una amenaza a la seguridad contractual" en el campo del derecho patrimonial privado, aunque entre los juristas franceses sea "intensamente sentida, como lo demuestra la doctrina de Planiol-Ripert". K. Larenz, Base del negocio jurídico y cumplimiento de los contratos, traducción española de C.

lesiona gravemente uno de los requisitos esenciales del contrato— el consentimiento. Además, los tratadistas concluyen que cuando advienen circunstancias imprevisibles que cambian la situación contractual que fue efectivamente querida, se viola el principio de la buena fe al exigir el cumplimiento, porque los efectos del contrato no han sido ni pensados ni queridos. Planiol-Ripert, *op. cit.*, pág. 559; Ripert y Boulanger, 6 <u>Tratado de derecho civil</u>, Editorial La Ley, Buenos Aires, 1964, pág. 295.

En Alemania, la base del negocio, como parte de la causa del contrato, es el fundamento jurídico que faculta la intervención de los tribunales para la modificación o extinción de los contratos. La vieja teoría de la presuposición elaborada por Windscheid contemplaba una declaración de voluntad basada en una circunstancia implícita que el declarante-contratante consideraba como cierta, presuponiendo su persistencia durante el período de la obligación. Esta tesis resultó objetable por la similitud entre la "presuposición" y el motivo subjetivo del contratante. Puig Brutau, *op. cit.*, pág. 356. Posteriormente, en un esfuerzo por distinguir entre los motivos para la contratación y la teoría de la presuposición, Oertmann desarrolló la teoría de la base del negocio definida como:

---

Fernández Rodríguez, Editorial Revista de Derecho Privado, Madrid, 1956, pág. 116.

> La representación mental de una de las partes en el momento de la conclusión del negocio jurídico, conocida en su totalidad y no rechazada por la otra parte, o la común representación de las diversas partes sobre la existencia o aparición de ciertas circunstancias, en la que se basa la voluntad negocial. K. Larenz, <u>Base del negocio jurídico y cumplimiento de los contratos</u>, traducción española de C. Fernández Rodríguez, Editorial Revista de Derecho Privado, Madrid, 1956, pág. 7.

Larenz supera la dificultad evidente de basarse en una condición interna de una de las partes (no obstante el requisito de conocimiento y aceptación del otro) postulando, según explica Puig Brutau, que:

> En el sentido *objetivo*, base del contrato es el conjunto de circunstancias cuya existencia y subsistencia presupone el mismo contrato, según su propia naturaleza. La cuestión principal, en este aspecto, es la de saber si todavía puede realizarse el fin del contrato a pesar de los cambios sobrevenidos. Sus dos principales hipótesis o supuestos de aplicación son el de la destrucción de la relación de equivalencia entre las prestaciones y el de la imposibilidad de alcanzar el fin del contrato. (Énfasis en el original.) Puig Brutau, *op. cit.*, pág. 358.

Esta doctrina admite la atención a la voluntad interna de una parte, pero limitada al estado de hechos objetivamente necesario para lograr la finalidad propuesta en el contrato o que manifestaron los contratantes. Larenz explica que la imposibilidad de alcanzar esta finalidad sólo afecta la subsistencia del contrato cuando se trate de la finalidad objetiva y común según la naturaleza del contrato. Larenz, *op. cit.*, pág. 165-166. Luego define la "base de negocio objetiva" como:

las circunstancias y estado general de las cosas cuya existencia o subsistencia es objetivamente necesaria para que el contrato subsista, según el significado de las intenciones de ambos contratantes, como regulación dotada de sentido.

Un contrato no puede subsistir como regulación dotada de sentido:
    *a*) cuando la relación de equivalencia entre prestación y contraprestación que en él se presupone, se haya destruído [sic] en tal medida que no pueda ya hablarse racionalmente de una "contraprestación";
    *b*) cuando la finalidad objetiva del contrato, expresada en su contenido, haya resultado inalcanzable, aun cuando la prestación del deudo sea todavía posible. Larenz, *op. cit.*, pág. 170.

En tal caso, la intervención de los tribunales y la resolución del contrato se justifican cuando surjan nuevas circunstancias que frustren la finalidad del negocio buscada por las partes. La autonomía de la voluntad se basa en la noción de que no hay libertad sin riesgo, pero Larenz reconoce que

En determinados casos, el "amparo para la revisión de contratos" suprime este riesgo [contractual]… a consideraciones de conveniencia y de equidad. No puede dudarse que todo ello significa no una ampliación, sino un quebrantamiento de los principios en que se basa nuestro Derecho de obligaciones. Larenz, *op. cit.*, págs. 218-219.

La facultad interventora de los tribunales se codificó en el *Codice Civile* italiano de 1942 bajo la doctrina de la excesiva onerosidad de la prestación. Según los artículos 1467 al 1469 del *Codice*, si la prestación de una de las partes se ha convertido en excesivamente onerosa por haberse producido

acontecimientos extraordinarios e imprevisibles, la parte
deudora de tal prestación puede pedir la resolución del
contrato (o si se trata de un contrato unilateral, la
modificación) y la parte contra la cual se dirige la
pretensión puede evitarla mediante el ofrecimiento de una
modificación equitativa de las condiciones del contrato.
Sin embargo, la resolución del contrato no procede si la
onerosidad sobrevenida se produce dentro de los riesgos
normalmente asumidos en la contratación.[8] Pino, *op. cit.*,
pág. 90-91. Superada las viejas teorías de la
presuposición o la cláusula sobreentendida, esta teoría
no dirige la atención a la voluntad de las partes, sino a
las circunstancias que inciden sobre la eficacia de la
causa del contrato. Según Díez-Picazo,

> [l]a causa del contrato es la función
> económica y social que el mismo debe
> llenar o cumplir. La causa puede faltar
> en todo o en parte, desde el origen del
> negocio o bien desaparecer más adelante
> durante la ejecución del negocio. Desde
> este punto de vista, la excesiva
> onerosidad sería precisamente el vicio

---

[8] "[Art.] 1467. Contrato con prestaciones correlativas.—
"En los contratos de ejecución continuada o periódica, o de ejecución diferida, si la prestación de una de las partes se ha hecho excesivamente onerosa por sobrevenir acontecimientos extraordinarios e imprevisibles, la parte deudora de semejante prestación puede pedir la resolución del contrato, con los efectos establecidos en el art. 1458.
"La resolución no puede pedirse si la onerosidad sobrevenida corresponde al elemento aleatorio normal del contrato.
"La parte contra la cual la resolución es exigida, puede evitarla ofreciendo modificar equitativamente las condiciones del contrato." Traducción en Puig Brutau, *op. cit.*, pág. 363.

funcional de la causa o un defecto parcial sobrevenido de la misma, tanto en el sentido genético como en el sentido funcional. Y ello en razón a que la ley acoge como principio general para los contratos la existencia de una adecuación del sacrificio patrimonial que el contrato presupone, en relación con el sacrificio patrimonial de la parte contraria. Fundamentos del Derecho civil patrimonial, Editorial Tecnos, Madrid, Segunda edición, 1983, pág. 881.

Inspirado en el derecho italiano, De Mallol señala en sus apuntes de derecho español de la obra de Augusto Pino que

…en los casos en que pueda invocarse la cláusula "rebus sic stantibus", el negocio jurídico es atacable, porque su causa se frustra. Se afirma que en los contratos de tracto sucesivo que tienen "dependentiam de futuro", las partes sólo prestaron su consentimiento en cuanto permaneciera la base de hecho que motivó el contrato; pero no si se altera profundamente. Pino, *op. cit.*, pág. 166.

Otros códigos más jóvenes han adoptado expresamente la doctrina de la excesiva onerosidad, como el Código Civil peruano de 1984 en sus artículos 1440 al 1446. En particular, el artículo 1440 dispone que:

En los contratos conmutativos de ejecución continuada, periódica o diferida, si la prestación llega a ser excesivamente onerosa por acontecimientos extraordinarios e imprevisibles, la parte perjudicada puede solicitar al juez que reduzca o que aumente la contraprestación, a fin de que cese la excesiva onerosidad.
Si ello no fuere posible por la naturaleza de la prestación, por las circunstancias o si lo solicitara el demandado, el juez decidirá la resolución del contrato. La resolución no se extiende a las prestaciones ejecutadas.

Además, el artículo 1441 extiende la aplicación de la doctrina a los contratos aleatorios cuando la excesiva onerosidad se produce "por causas extrañas al riesgo propio del contrato."

En España, la jurisprudencia revela que la revisión del contrato tiene una base jurídica en el principio de la buena fe y en el fallo de los mecanismos causales del negocio.[9] En particular, la Sentencia de 23 de noviembre de 1962, en lo pertinente, dispone que:

> …es indudable que *la base del negocio* contenido en el contrato celebrado el 30 de junio de 1939, dadas las circunstancias que lo rodean y *la finalidad perseguida* en el mismo, sufrió una grave y *excepcional alteración* en contra de lo que las partes podían *presuponer*, por la supervivencia de *acontecimientos imprevisibles*, que afectaron profundamente al elemento de *justicia*, objetivo implícito en la exigencia de *causa* en los contratos, y *la equivalencia de las prestaciones*… (Énfasis suplido.)

En esta sentencia el Tribunal Supremo español declaró que la cláusula *rebus sic stantibus* "debe tender a la modificación equitativa de los pactos del contrato, sin darle un alcance rescisorio o exoneratorio de las obligaciones". El Tribunal también trae a colación el artículo 1258, equivalente al artículo 1210 nuestro, que

---

[9] Así, Díez-Picazo señala que el nexo entre la modificación de los contratos por circunstancias sobrevenidas y el principio de la buena fe se ha incorporado en España a tenor con el desarrollo de la jurisprudencia germánica que permite la posible modificación o resolución de las relaciones contractuales, partiendo de la obligación de efectuar la prestación como exigen la fidelidad y la buena fe que

establece que "los contratos obligan no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que, según su naturaleza, sean conforme a la buena fe, al uso y a la Ley" y añade que:

> …es justa consecuencia de *buena fe*, en sentido objetivo, el restablecimiento de la base contractual con *la reciprocidad real y equitativa de las obligaciones* para en mejor cumplimiento de la finalidad legal, conforme a la causa motivadora del contrato, cuando median las excepcionales circunstancias… (Énfasis nuestro.)

Díez-Picazo y Vallet de Goytisolo, ambos, han reconocido que la cláusula *rebus sic stantibus* está cobijada por el principio de la buena fe, tomando como fundamento las expresiones del Tribunal Supremo español en esta sentencia. *Véase*, Díez-Picazo, *op. cit.*, pág. 884; Vallet de Goytisolo, Panorama del Derecho civil, Segunda edición corregida, Editorial Bosch, Barcelona, 1973, pág. 212-213. La buena fe impone una regla jurídica de comportamiento en el desenvolvimiento de las relaciones obligacionales y, como principio general del derecho, todo el ordenamiento jurídico se debe interpretar en armonía con éste. Díez-Picazo, *op. cit.*, pág. 886. Así, ambos tratadistas concluyen que no debe haber problema en aceptar la resolución o modificación de las relaciones contractuales cuando desaparece la base del negocio, ya que éste responde al principio de la buena fe. Sin más, deducen que la facultad modificadora

---

establece el parágrafo 242 del BGB. Díez-Picazo, *op. cit.*, pág. 885-886.

de los tribunales surge de la equidad, de la justicia y de la buena fe, sin que para ello sea necesario aplicar la cláusula *rebus sic stantibus*.

El principio de la equivalencia de las prestaciones no es solamente una parte integral del principio general de la buena fe, sino que además incide sobre el requisito esencial de la causa.[10] Así lo reconoce explícitamente la sentencia del Tribunal Supremo español de 23 de noviembre de 1962 antes citada. Esta reciprocidad o equivalencia no está trazada expresamente en nuestro Código Civil. Sin embargo, se trata de un principio que es parte del ordenamiento contractual de la mayoría de los países civilistas y tiene su antecedente en el artículo 1104 del *Code Napoleon*. Rezzónico, <u>Principios fundamentales de los contratos</u>, Editorial Astrea, Buenos Aires, 1999, pág. 298. El mismo reza que el contrato es conmutativo (y no aleatorio) cuando cada una de las partes se obliga a dar o a hacer una cosa que se considera como el equivalente de lo que se le da o de lo que se hace por ella.[11] Esencialmente, este principio responde al concepto aristotélico de justicia conmutativa que requiere

---

[10] La causa del contrato, entendida como la función económica y social que éste cumple, desaparece parcial o totalmente, cuando queda roto el equilibrio entre las prestaciones… o cuando resulta imposible de alcanzar el fin del contrato. *Íd*.

[11] Art. 1104 del *Code Napoeleon*— "Il est commutatif lorsque chacune des parties s'engage à donner ou à faire une chose qui est regardée comme l'équivalent de ce qu'on lui donne, ou de ce qu'on fait pour elle.

igualdad entre lo que se da y lo que se recibe, sin

exigir para ello una identidad plena o una equivalencia

matemática. Rezzónico, *op. cit.*, pág. 297.[12]

La discusión de este principio contractual de

equivalencia de las prestaciones usualmente va de la mano

con la aplicación de la cláusula *rebus sic stantibus.*

Según Arechederra Aranzadi, la aplicación de dicha

cláusula responde a criterios de justicia y buena fe,

pues mantener la equivalencia de las prestaciones es una

de las exigencias de la buena fe.  Así lo expresó en su

obra <u>La equivalencia de las prestaciones en el derecho</u>

<u>contractual</u>:

> La naturaleza onerosa del contrato
> esgrimida frente a tercero o gravemente
> quebrantada acaba demandando aquello que
> inicialmente no se le exige: el equilibrio
> de las prestaciones.  Tal vez se trata de
> una exigencia de la buena fe "según la
> naturaleza del contrato".
> Así, siendo el principio el mismo[,]
> despliega una doble función.  En primer
> lugar, desempeña el papel de indicio de una
> situación que reclama una solución de
> justicia.  En segundo lugar, aparece como
> criterio regulador de dicha situación sin
> mediación de norma positiva como simple
> exigencia de justicia.  Arechederra
> Aranzadi, <u>La equivalencia de las</u>

---

"Lorsque l'équivalent consiste dans la chance de gain ou de perte pour chacune des parties, d'après un évènement incertain, le contrat est aléatoire."

[12] "Tanto los pitagóricos como el mismo Aristóteles decían que en un contrato bilateral de cambio, la justicia exige que *el uno reciba del otro tanto como él entregue;…*" (Énfasis en el original.) Rezzónico, *op. cit.*, pág. 297. En cuanto a la equivalencia objetiva, Larenz plantea que cada parte contractual debe recibir una prestación que sea equitativa respecto a la suya con independencia de su valoración personal, pero además debe haber una adecuada distribución de cargas y riesgos vinculados al contrato. Rezzónico, *op. cit.*, pág. 311.

<u>prestaciones  en  el  derecho  contractual</u>, Editorial  Montecorvo,  Madrid,  1978,  pág. 233.

En  Puerto  Rico  hemos  aplicado  la  cláusula  *rebus  sic stantibus*  en  aquellas  situaciones  en  que  el  desequilibrio entre  las  prestaciones  producido  por  cambios extraordinarios  e  imprevisibles  en  el  estado  de  hechos posterior  a  la  celebración  de  un  contrato,  llega  a dimensiones  de  mala  fe,  hiere  el  principio  de  la voluntariedad  y  hace  el  cumplimiento  excesivamente oneroso  para  una  de  las  partes.  En  el  caso  de  <u>Casera  v. E.L.A.</u>,  supra,  y  citando  a  Calderón  sobre  el funcionamiento  de  la  teoría  de  la  imprevisión,  recogimos las  siguientes  expresiones:

> "…la  seguridad  en  el  tráfico  queda  más  bien reforzada,  pues  los  contratantes  pueden contar  con  que  en  el  caso  de  una perturbación  extraordinaria,  el  negocio  se podrá  dejar  sin  efecto  o  amoldarlo  a  las nuevas  circunstancias."  La  doctrina  [de  la revisión  del  contrato  por  alteración  de  las circunstancias]  sería  una  justa consecuencia  de  los  principios  de  buena  fe y  de  la  reciprocidad  en  los  contratos bilaterales;  y  no  hay  nada  que  se  oponga  a su  incorporación  fuera  de  los  casos  en  que existe  una  disposición  concreta,  como  en los  artículos  1465,  1466,  1485  y  1517  del Código  Civil.  (Citas  omitidas.)  <u>Casera  v. E.L.A.</u>,  supra,  pág.  855.

De  esta  forma,  hemos  reconocido  la  utilidad  y pertinencia  de  las  doctrinas  de  imprevisión,  reciprocidad de  las  prestaciones  y  excesiva  onerosidad  antes mencionadas.  Después  de  todo,  el  elemento  integrador  de todas  éstas,  y  de  la  cláusula  *rebus  sic  stantibus*  es  el principio  inmanente  en  toda  relación  contractual,  la

buena fe.[13]  Esto nos ha llevado a concluir que, si bien las partes tienen la libertad de contratación y la oportunidad de pactar las salvedades necesarias para atender los riesgos que fueren previsibles y proteger de esa forma sus intereses, sería contrario a la voluntad de las partes y a la buena fe como contenido y como norma de interpretación de los contratos, extender el alcance de las obligaciones a eventos y circunstancias que las partes no hubieran aceptado si hubieran sido previsibles. Casera v. E.L.A., supra, pág. 855;[14] Rodríguez López v. Municipio de Carolina, 75 D.P.R. 479, 492 (1953).

_____

[13] Del mismo modo, el profesor Godreau opina que "la equivalencia de las prestaciones—independiente del cambio radical en la base del negocio—surge así como una exigencia ética que encuentra camino hacia el derecho positivo vía el principio de la buena fe". Godreau, Lealtad y buena fe contractual, 58 Revista Jurídica de la U.P.R. 367, 408 (1989).

[14] En Casera v. E.L.A., supra, pág. 856, adoptamos los siguientes requisitos necesarios para que se dé la revisión del contrato por los tribunales aplicando la cláusula *rebus sic stantibus*:
1) La fundamental de la imprevisibilidad que implica una cuestión de hecho dependiente de las condiciones que concurran en cada caso.
2) Que se produzca una dificultad extraordinaria, una agravación de las condiciones de la prestación, de manera que resulte mucho más onerosa para el deudor, sin llegar al grado extraordinario en que se confundiría con la imposibilidad de la prestación, y que es también una cuestión de hecho sobre la que es difícil dar reglas de carácter general.
3) Que el riesgo no haya sido el motivo determinante del contrato, como sucedería en el caso de contrato aleatorio.
4) Que no exista acción dolosa en ninguna de las partes, ya que los efectos de los supuestos delitos y cuasi delitos están especialmente predeterminados en la ley.
5) Que el contrato sea de tracto sucesivo o este referido a un momento futuro, de modo que

Hay una discusión en la doctrina española sobre la función de la buena fe como criterio para la interpretación de los contratos.  Por lo general, quienes le reconocen esa función se refieren a la exigencia de buena fe en el cumplimiento del contrato pautado en el artículo 1258 del Código Civil español, equivalente al artículo 1210 de nuestro Código.[15] Ahora bien, De Castro no describe la buena fe como un instrumento de interpretación en un sentido estricto para inquirir sobre la verdadera voluntad, sino como "una manifestación… de la responsabilidad objetiva por la conducta negocial." Díez-Picazo, *op. cit.*, pág. 64, con citas de De Castro. Asimismo, Díez-Picazo afirma que:

> la buena fe que invoca el art. 1.258 CC [equivalente al artículo 1210 nuestro] es mucho más que una directriz de interpretación.  Ella misma entraña deberes para los contratantes: por de pronto, un deber de honestidad; pero también, con un sentido mucho más positivo, un deber de cooperación y un criterio para puntualizar

---

> tenga cierta duración, pues para los contratos de ejecución instantánea o aquellos que han sido ya ejecutados no existe el problema.
> 6) Que la alteración de las circunstancias sea posterior a la celebración del contrato (ya que así lo exige la misma naturaleza de acontecimiento imprevisible) y presente carácter de cierta permanencia (elemento que viene exigido también por el carácter extraordinario que se exige a la alteración).
> 7) Que exista petición de parte interesada.
> 8)

[15] El artículo 1258 del Código Civil español, equivalente al artículo 1210 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3375, reza: "Los contratos se perfeccionan por el mero consentimiento, y desde entonces obligan, no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley."

derechos y deberes de las partes.  Díez-
Picazo, *op. cit.*, pág. 65.

Así pues, sobre la base de dicho principio general de la buena fe no sólo se limita la autonomía de la voluntad y las cláusulas que puedan pactar las partes, según los dictámenes del artículo 1207, *supra*, sino que además, los tribunales pueden interpretar dichas cláusulas conforme a las obligaciones que nacen de la buena fe contractual.

El Código Civil reitera en diversos contextos el principio imperioso de que los contratos se deben interpretar en todo momento de forma que se resguarde la intención de las partes y se proteja la naturaleza del contrato.  Por ejemplo, el artículo 1236 del Código Civil dispone que cuando una cláusula admitiere diversos sentidos se deberá entender que el sentido más adecuado para que produzca efecto el contrato. Art. 1236 del Código Civil, 31 L.P.R.A. sec. 3474. El efecto más adecuado se refiere a la eficacia del tipo, la función económica del contrato y también "la finalidad práctica que trata de alcanzar." Puig Brutau, *op. cit.*, pág. 234-235. Cuando las palabras pudieran tener diversos sentidos, se deberá entender aquél que sea más conforme a la naturaleza y objeto del contrato. Art. 1238 del Código Civil, 31 L.P.R.A. sec. 3476. Igualmente, la naturaleza del contrato se refiere al tipo genérico del contrato, por ejemplo, una compraventa o un arrendamiento, mientras que el objeto se refiere a su finalidad. Puig Brutau, *op. cit.*, pág. 233. El "canon hermenéutico de la totalidad"

obliga a interpretar las cláusulas del contrato según el sentido unitario, para buscar el sentido que resulte del conjunto del todo. Art. 1237 del Código Civil, 31 L.P.R.A. sec. 3475; Puig Brutau, *op. cit.*, pág. 235.

Para juzgar la intención de las partes, el Código Civil establece que se deberá atender principalmente a los actos de éstas, coetáneos y posteriores al contrato. Art. 1234 de Código Civil, 31 L.P.R.A. sec. 3472. Según Puig Brutau,

> Este artículo pone en manifiesto lo que Díez-Picazo llama la "conducta interpretativa". Esta interpretación por la conducta no sólo puede y debe hacerse teniendo en cuenta los actos coetáneos y posteriores al contrato, sino igualmente los anteriores, y quizá con mayor razón, pues, como ya decía De Diego, en actos preparatorios puede encontrarse el mejor índice de la voluntad de los interesados. Puig Brutau, *op. cit.*, pág. 231.

Además, la doctrina señala que el juzgador debe examinar todas las circunstancias concurrentes aunque parezca que las partes se han expresado en términos claros. Puig Brutau, *op. cit.*, pág. 232.

En varias ocasiones hemos afirmado que los tribunales pueden atemperar la irracionalidad de la causa del contrato cuando ésta vulnera el principio de la reciprocidad de las prestaciones y la norma de la buena fe. Municipio de Ponce v. Aut. de Carreteras, 153 D.P.R. 1 (2000); Levy v. Aut. Edif. Públicos, 135 D.P.R. 382 (1994). De esta norma surge la facultad modificadora de los tribunales para intervenir con los contratos cuya

causa irracional lacera la buena fe contractual. Como la buena fe contractual protege el valor de lealtad que cada contratante le debe al otro a partir de las expectativas razonables que su relación particular genera, la excesiva onerosidad del contrato que alcance dimensiones de mala fe y sea contraria a la conducta honrada y leal que se debe al momento de la contratación justificaría la intervención moderadora del tribunal. Esta facultad se puede dar a la luz de los deberes que surgen de de la buena fe al momento de interpretar los contratos y del principio de la equidad que obliga preservar la justicia.

Además de reconocer la vigencia de la cláusula *rebus sic stantibus* en nuestro derecho contractual, hemos reconocido la facultad que tienen los tribunales para intervenir con los contratos amparados en otros fundamentos jurídicos desarrollados a partir de los principios generales del derecho. En <u>Colón v. San Patricio Corp.</u>, 81 D.P.R. 242 (1959), utilizamos el concepto de la frustración de los fines del contrato para precisar la naturaleza de los cambios que pueden dar lugar a la modificación o extinción de una servidumbre en equidad.[16] Acorde a este criterio, determinamos que para

---

[16] Las servidumbres en equidad nacen de una relación contractual, pero están sujetas a los principios de la equidad del *common law* en cuanto a su extinción o modificación. La jurisprudencia del *common law* establece que cuando ocurren cambios en el vecindario de tal naturaleza que frustre la consecución de los beneficios que dieron lugar a las restricciones y el propósito mismo de la servidumbre, los tribunales pueden relevar al dueño del predio gravado del cumplimiento de las restricciones

justificar nuestra intervención modificadora, o demostrar

la extinción de la servidumbre pactada, los cambios en el

vecindario deben ser

> …de carácter radical y permanente, e
> impidan sustancialmente la consecución de
> las ventajas y de los beneficios
> establecidos a favor de los predios
> dominantes. En otras palabras, si por
> razón de cambios radicales y permanentes
> en las condiciones del vecindario, resulta
> prácticamente *imposible realizar o lograr
> los fines que perseguía la servidumbre en
> equidad*, entonces ésta queda modificada o
> extinguida. (Énfasis nuestro.) <u>Colón v.
> San Patricio Corp.</u>, supra, pág. 264-265.

Del mismo modo, en cuanto a las cláusulas penales,

reconocimos el deber de crear un "remedio en equidad

contra el rigor o la excesiva onerosidad" a través de la

facultad moderadora de los tribunales dispuesta en el

artículo 1108 del Código Civil, 31 L.P.R.A. sec. 3133.

<u>Jack's Beach Resort v. Cía. De Turismo</u>, 112 D.P.R. 344,

350 (1982).[17]  En lo pertinente explicamos:

> Al resultado de frenar el predominio
> absoluto de la autonomía de la voluntad,
> bien moderando los efectos de los
> contratos, ya limitando su obligatoriedad
> según normas de *buena fe*, ha de llegarse
> únicamente en circunstancias

---

pactadas. <u>American law of Property</u>, 1952, sec. 9.39.
*Véase*, 6 <u>Restatement of the Law Third—Property</u>, 1997,
sec. 7.10: "When a change has taken place since the
creation of a servitude that males it impossible as a
practical matter to accomplish the purpose for which the
servitude was created, a court may modify the servitude
to permit the purpose to be accomplished. If the
modification is not practicable, a court may terminate
the servitude."
[17] Reconocimos entonces que ésta era una de las situaciones
en que por excepción, "el Código incorpora la equidad al
derecho positivo y ordena que se pondere en la aplicación
de la norma al punto en que la resolución del tribunal
pueda descansar de manera exclusiva en ella". *Íd.*

extraordinarias, como medio de *templar su excesiva onerosidad* para el obligado, o la *desorbitada desproporción*. (Énfasis suplido.) *Íd.*

Cierto es que "la facultad judicial de moderación debe usarse sólo con gran cautela y notoria justificación". *Íd.* Ciertamente, una desproporción intolerable entre las prestaciones que derrote la base del contrato justificaría tal intervención. En particular:

> El juez, de acuerdo con la pauta objetiva, mide lo que podemos llamar la "desproporción tolerable". Dentro de unos criterios "standarizados" socialmente, normales, objetivos y sobre la base de una libertad reconocida por el ordenamiento a las partes (art. 1.255), el juez pondera el límite hasta el cual es mantenible—sin ser gravemente atentatorio a la justicia—el principio "pacta sunt servanda". Por ello, por muy subjetivista que sea la equivalencia, la excesiva onerosidad de la prestación es un fenómeno objetivo, advertido como intolerable por el juez. Arechederra Aranzadi, *op. cit.*, pág. 231.

No debemos olvidar que los contratos, más allá de ser la expresión de la autonomía y libertad de la persona, son también instrumentos de justicia distributiva y de interés social. El ordenamiento le brinda protección de ley a estas obligaciones que nacen de la voluntad de sus contratantes, pero exige una causa que asegure la justicia social trascendente como requisito para justificar su exigibilidad y respaldo estatal. Arechederra Aranzadi, *op. cit.*, pág. 35; Entenza Escobar, Los principios generales de derecho contractual puertorriqueño, 3 Revista de Derecho Puertorriqueño 21,

23 (1962). La función del contrato en un mercado libre, como originalmente lo concibieron los codificadores, ha mermado y la intervención del Estado en asuntos de economía y de mercado necesariamente debe resultar en una reformulación del derecho en cuanto a la atribución de derechos y deberes entre los contratantes, por encima de la aplicación estricta de la libertad contractual. Godreau, *op. cit.*, pág. 402.

### III

La sucesión Talavera reclamó la aplicación de la cláusula *rebus sic stantibus* por existir tal desproporción entre las contraprestaciones que a su entender se justifica la rescisión de la opción de compraventa o la intervención modificadora del tribunal. Sin embargo, según el marco doctrinal que hemos expuesto, no estamos constreñidos a examinar los hechos desde la perspectiva propuesta por los peticionarios pues la equidad nos permite mitigar la severidad de la aplicación de la norma general a un caso en particular si al aplicar la letra clara de la ley o el texto claro del contrato se obtiene una solución insólita e injusta.

En el caso particular ante nuestra consideración, la señora Talavera no residía en Puerto Rico y los autos están huérfanos de prueba que nos permita concluir que al momento de contratar ella conocía o debió conocer sobre los cambios urbanos que pudieran afectar en un futuro el valor de la propiedad. Tampoco hay en el expediente

prueba que nos lleve a resolver que en ese momento era previsible el gran incremento de valor que eventualmente tuvo su propiedad. Por otro lado, Commonwealth reconoció los beneficios del negocio y logró acordar un arrendamiento por 25 años con opción a compra por $22,500.00. Tan lucrativo lucía el negocio que el BPPR posteriormente adquirió el contrato de arrendamiento con opción a compra, pagándole a Commonwealth, apenas cinco años después, la cantidad de $86,493.87, <u>cuatro veces el valor de la propiedad</u> pactado en el contrato.

Estamos de acuerdo con el Tribunal de Primera Instancia en su apreciación de que ni en la industria bancaria ni en la de compraventas entre particulares se pacta una cláusula de opción que se extienda en el tiempo al grado en que se pactó en este caso, sin incluir salvedad alguna o forma de revisar los precios. Al evaluar los informes periciales presentados, el Tribunal de Primera Instancia encontró que si se hubiera pactado la compraventa en 1998, el precio de la propiedad hubiera fluctuado entre $312,000.00 y $497,000.00, de manera que el precio pactado en 1968 equivalía a entre un 4% y un 7% del valor real del inmueble al vencer el contrato de arrendamiento. Se trata, evidentemente de un precio irrisorio que afecta la causa, un elemento esencial para la validez del contrato. A falta de evidencia de la intención de simular la causa, reconocemos que no estamos

ante una causa falsa. Por otro lado, tampoco surge la intención de la señora Talavera de donar su propiedad.

Tampoco podemos atribuirle a la carta suscrita por la señora Talavera en 1983 el efecto de ratificación de contrato que alega el BPPR. Se trata más bien de una apelación a la buena fe del BPPR, ante las evidentes dificultades económicas de la señora Talavera. La carta, si bien no repudia el contrato, adolece de los mismos defectos de éste. Por eso, no podemos derivar  de la carta de 1983 una intención de donarle al BPPR el inmueble al cabo del término establecido en el contrato de arrendamiento.

La intención que debe derivarse del contrato debe ser la intención que tuvieron las partes al momento de contratar. Es claro que en ese momento, y luego, al enviar la carta de 1983, la intención de la señora Talavera era la de pactar un contrato oneroso y por esa causa fue que prestó su consentimiento. Necesariamente tenemos que concluir que el contrato de 1968 era un contrato oneroso y no gracioso, porque inicialmente se procuró establecer una equivalencia en las prestaciones en caso de que el arrendatario decidiera ejercer su derecho a la opción. Sin embargo, en la medida en que pasaron los años, el aumento en el valor de la propiedad fue quebrantando la equivalencia inicial que hubo entre las prestaciones. Avalar la venta de una propiedad por el 4% ó el 7% de su valor real es una desproporción

intolerable que hiere la causa del contrato y la buena fe que se deben las partes durante toda la vida de la relación contractual.

El estado de indefensión de la señora Talavera fue patente y claramente establecido en la carta de 1983 cuando le pidió asesoramiento al BPPR porque "realmente dependo de usted y su buena fé [sic] en este caso". En primer lugar, el precio de compraventa no era $30,000.00, sino $22,500.00 y se había acordado un pago de $10,000.00 para poder ejercer la opción. La carta evidencia una falta de conocimiento de parte de la señora Talavera no sólo en cuanto al Derecho, sino sobre el negocio pactado. Evidencia también la necesidad que tenía de asesoramiento. Por otro lado, el BPPR, con su conocimiento especializado, no contestó la carta ni respondió en forma alguna a la petición de la señora Talavera. En vez, esperó los diez años restantes para ejercer la opción en el 1993 y exigir que se cumpliera con el pacto original. No hay duda que estamos ante un contrato sumamente lucrativo para el BPPR, en grave perjuicio de los intereses de la señora Talavera y la sucesión.

Exigirle a la sucesión Talavera que venda su propiedad por un precio ridículo e irrisorio lacera el principio de reciprocidad entre las prestaciones que es esencial a las obligaciones bilaterales. Imputarle a la señora Talavera, y por consiguiente a su sucesión, el

haber asumido este riesgo y mantenerles vinculados contractualmente luego de tales cambios imprevisibles, quebrantaría significativamente el principio de la autonomía de la voluntad y violentaría los principios de equidad y buena fe.

Como expresamos anteriormente, los tribunales deben atemperar los perjuicios que puedan causársele a una parte cuando se hieren principios fundamentales de nuestro ordenamiento, como lo es la buena fe contractual. La facultad judicial de moderación responde a preceptos equitativos y busca establecer un remedio justo para las partes cuando el cumplimiento del contrato desprecia la justicia inherente de la autonomía. Ciertamente es una facultad que se debe ejercer con cautela, pues es una intromisión del Estado en la libertad de contratación, pero no debemos perder de vista que cuando se presentan circunstancias tan peculiares como la que tenemos ante nuestra consideración, entre partes tan disímiles y de tan grande disparidad en su fuerza de contratación, la ley debe proteger intereses más allá de los derechos privados adquiridos y procurar salvaguardar la justicia encarnada en nuestro ordenamiento. Los contratos son medios de creación y distribución de riquezas y el hecho de estar protegidos por la ley los reviste de una apariencia de justicia y legitimidad que los tribunales deben salvaguardar.

Cuando la justicia requiere la intervención de los tribunales conforme a la equidad y la buena fe porque desaparece la base del negocio y falla la causa del contrato, la posibilidad de moderar el contrato rebasa el campo de lo subjetivo y los tribunales no están limitados por los criterios elaborados en Casera v. E.L.A., supra, para la aplicación de la cláusula *rebus sic stantibus*. Así, aunque subjetivamente el aumento en valor de la propiedad era una condición extraordinaria e imprevisible para la señora Talavera que ella no pudo tomar en cuenta al momento de prestar su consentimiento, lo cierto es que, objetivamente, la desproporción entre el valor asignado a la propiedad en 1968 y el valor real de ésta en 1993 constituye una falla en la causa del contrato que vulnera la buena fe y el principio de justicia conmutativa, puntal principal de la autonomía de la voluntad. Igualmente, vulnera el principio de *pacta sunt servanda*, ya que objetivamente se trata de un contrato distinto al que ella suscribió. Aunque el principio de *pacta sunt servanda* establece la obligatoriedad de los contratos según sus términos, en esta situación la aplicación de la letra clara de la ley produciría una injusticia de tal gravedad que derrotaría el principio de la autonomía de la voluntad y la intención de las partes al celebrar un contrato oneroso.

Considerando el conocimiento especializado del BPPR, la indefensión de la señora Talavera y el total

desconocimiento que tenía ésta sobre la posibilidad de que se dieran los cambios extraordinarios en el valor de su propiedad que le perjudican desproporcional e injustamente, todo lo cual determinó el Tribunal de Primera Instancia, revocamos la decisión del Tribunal de Apelaciones. Para preservar la causa del contrato y restablecer la equivalencia debida en las prestaciones bajo la doctrina de la equidad, mantenemos la orden del Tribunal de Primera Instancia dictada en el ejercicio de su facultad moderadora, que establece un período de sesenta días en el cual las partes podrán acordar un precio de compraventa justo, de interesar el BPPR adquirir aún la propiedad. Si las partes no logran acordar el precio que debe pagarse por la propiedad, el Tribunal de Primera Instancia señalará vista para determinar el precio justo que corresponda. A esos fines, se devuelve el caso al foro de instancia.

Se dictará sentencia de conformidad.


Liana Fiol Matta
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Banco Popular de Puerto Rico
        Recurrido

            v.

 Sucn. Talavera t/c/c Rita          CC-2004-922   *Certiorari*
 Talavera Taylor t/c/c Rita
 Talavera de Taylor y otros
        Peticionaria


*SENTENCIA*


En San Juan, Puerto Rico, a 31 de julio de 2008.

    Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente Sentencia, se revoca la sentencia del Tribunal de Apelaciones y se mantiene la orden del Tribunal de Primera Instancia dictada en el ejercicio de su facultad moderadora. Se devuelve el caso al Tribunal de Primera Instancia para la continuación de los procedimientos acorde a lo pautado.

    Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rivera Pérez concurre sin opinión escrita. La Jueza Asociada señora Rodríguez Rodríguez está inhibida.


                        Aida Ileana Oquendo Graulau
                        Secretaria del Tribunal Supremo